(No. 17451.—Reversed and remanded.)
THE WESTERN THEOLOGICAL SEMINARY, Appellant, *vs.*
THE CITY OF EVANSTON, Appellee.

*Opinion filed April 20, 1927—Rehearing denied June 8, 1927.*

1. WORDS AND PHRASES—*meaning of the words "lodging" and "lodging house."* The word "lodging," as a noun, in its ordinary use refers to a temporary place of abode,—particularly sleeping quarters,—and the words "lodging house" refer to a house where lodgings are let for hire.

2. SAME—*meaning of the word "dormitory."* The word "dormitory," in its ordinary and present use, refers to a building or large room belonging to a school or college in which students sleep and sometimes board and study; and a dormitory is not a lodging house in the ordinary sense, as its accommodations are not let for hire to transient guests and are not primarily a source of profit but are furnished the students by and under the authority of the school or college of which the dormitory is a part.

3. MUNICIPAL CORPORATIONS—*what provision in zoning ordinance permits erection of dormitories in a residential district.* A provision in a zoning ordinance permitting the erection in a residence district of "schools and colleges" permits the erection of all college buildings, including dormitories, which are used by the school or college in the immediate carrying on of its educational purposes, notwithstanding fraternity houses and boarding and lodging houses are classified in another district referred to as "B" residence district.

4. SAME—*when amendment of zoning ordinance is invalid as taking away right of property.* Where a zoning ordinance permits the erection of "schools and colleges" in a residence district, and in reliance upon the ordinance a theological seminary, which does not have the right of eminent domain, has purchased extensive grounds for a campus and is taking subscriptions for funds for the erection of buildings, an amendment of the ordinance striking out the words "schools and colleges" and inserting "public institutions having the right of condemnation" is invalid, where it has no basis under the police power for the protection of the public health, comfort, safety or welfare.

5. CONSTITUTIONAL LAW—*right of a citizen to use of property cannot be taken away except under police power.* The right to the use of property is both a liberty and a property right, and

neither a city council nor the legislature is authorized, under the constitution, to take away or limit a citizen's right to make any use of his property which was lawful at the time he acquired it, except in such ways as under the police power may be necessary for the protection of the public health, comfort, safety or welfare.

6. POLICE POWER—*extent of police power.* The police power is limited to enactments having reference to the public health, comfort, safety or welfare.

7. SAME—*whether an act is a proper exercise of police power is a question for courts.* The legislative determination as to what is a proper exercise of the police power is not conclusive, and it is a question for the courts whether the means employed have any real, substantial relation to the public health, comfort, safety or welfare or whether they are arbitrary and unreasonable, and in determining that question the courts will disregard mere forms and interfere for the protection of rights injuriously affected by arbitrary and unreasonable action.

8. EQUITY—*when equity will enjoin enforcement of an invalid zoning ordinance.* Equity will not enjoin the enforcement of a void ordinance on the ground, alone, of its invalidity or of apprehension in regard to what may be done under it, but it will enjoin the enforcement of a zoning ordinance as amended where the effect of the amendment is to arbitrarily deprive the complainant of the right to use, for the establishment of a college, extensive grounds which it had purchased in reliance upon the ordinance prior to its amendment and where the effect is to cloud complainant's title, is immediately destructive of the value of the property for the use intended and hinders the complainant in securing funds for building purposes.

APPEAL from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding.

F. F. & J. V. NORCROSS, (J. V. NORCROSS, and HARRY E. SMOOT, of counsel,) for appellant.

TENNEY, HARDING, SHERMAN & ROGERS, and WILLIAM LISTER, Corporation Counsel, (HORACE KENT TENNEY, HENRY F. TENNEY, and S. ASHLEY GUTHRIE, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The circuit court of Cook county having dismissed for want of equity, after sustaining a demurrer thereto, an amended bill for an injunction filed by the Western Theological Seminary against the city of Evanston, praying that a certain ordinance of the city approved April 1, 1925, be decreed to be invalid and that the city be restrained from enforcing or threatening to enforce the provisions of such ordinance, the complainant has appealed.

The bill averred that the city council of the city of Evanston adopted a zoning ordinance on January 19, 1921, which divided the city into five districts according to the use permitted of property in the respective districts. "A" district was a residence district, in which the ordinance provided that all buildings and premises "should be erected for and used exclusively as (1) single-family dwellings; (2) churches and temples; (3) libraries; (4) schools and colleges; (5) farming and truck gardening." Block 84 in Evanston is in this district.

The Western Theological Seminary is a corporation, not for profit, organized under the laws of the State of Illinois for the purpose of establishing and carrying on an institution of learning and religion, in association with the Protestant Episcopal Church of the United States, for school and educational purposes. Pursuant to the powers of its charter it acquired property on West Washington boulevard, in Chicago, on which it erected buildings and for over forty years carried on an institution to educate men for the ministry of the Episcopal church. During this term it acquired a valuable library and substantial endowment and has offered its students a regular course of study appropriate to its purposes. In 1923 it obtained a lease from the Garrett Biblical Institute and the Northwestern University of a part of block 84 in the city of Evanston in perpetuity, unless it should cease to maintain its corporate existence or to carry out and observe the objects for which

325—33

it was organized, in which lease it was provided that the premises should be used by the complainant only as a site for such educational buildings as might be deemed necessary for carrying forward its work as provided by its charter and not otherwise, and that the buildings to be erected upon the property so leased should be for the exclusive use of the lessee and for educational purposes only. Later in 1923 the complainant purchased another part of block 84 for $47,000, and in doing so, as well as in taking the lease, it relied on the zoning ordinance, and particularly on the provisions authorizing the erection and use of buildings for schools and colleges in district "A." In anticipation of moving its theological school to Evanston it sold its property on West Washington boulevard, in Chicago, and made preparations to erect in Evanston the buildings usual, necessary and convenient for carrying on the purposes authorized by its charter, and it was and is its purpose to construct such buildings upon the premises in block 84. These buildings include a chapel, library, assembly room, students' commons or dining room, a group of students' dormitories for the accommodation of fifty-six students, and houses for the officers and employees of the complainant. All of the buildings are necessary in carrying on the theological school and caring for its expected expansion. The complainant intends them to be fireproof and permanent in character and of pleasing architectural design and arrangement, and proposes to build them in full accordance with all valid provisions of the building code and other ordinances of the city. The dormitories and students' dining room are not to be operated for profit but are to be used solely by students of the complainant. In order to improve its property with buildings suitable for its purpose it was necessary for the complainant to conduct a campaign to raise sufficient funds by private subscription, and, in order to submit a plan to persons asked to subscribe, the complainant at great expense secured the services of

an architect, who made preliminary sketches of the proposed buildings, showing their elevations, height, ground measurements and their relation to streets and alleys, etc. A publicity campaign was prepared, and in all the advertising made it was stated that the proposed buildings would be located on block 84. The architect's plans were designed for said premises and were suitable and adaptable to no other site. The complainant's intention to build in Evanston upon these premises was widely circulated and large sums of money were subscribed for that purpose by residents of the city.

In December, 1923, the complainant asked the council to vacate a part of an alley running north and south through a part of block 84. The application was referred to a committee and a public hearing was held at which various objecting property owners opposed the vacation, and the committee, after full consideration, reported to the council on December 2, 1924, that it had decided to take no action on the vacation of the alley until the complainant had obtained a decision from the building commissioner as to whether the proposed buildings and use of the leased premises were within the uses permitted in "A" residence district. The council adopted this report, and the complainant on December 9, 1924, applied to the building commissioner for a use and occupancy permit of the premises and filed with its application copies of sketches made by its architect showing the uses of the proposed buildings, including the students' commons or dining room and dormitories, together with a letter to the commissioner stating that the dormitories and dining rooms were not to be operated for profit but for the convenience of the students of the complainant. On the same day it was presented the commissioner refused to issue the permit, stating that the proposed use was not in conformity with "A" use and restrictions. The complainant appealed from the decision of the building commissioner to the zoning board of appeals. A pub-

lic hearing of this appeal was held on December 30, 1924, and various property owners appeared and objected to the granting of a use and occupancy permit. The board of appeals reversed the action of the building commissioner, and found, in substance, that the proposed group of college buildings would not violate the zoning ordinance and the building commissioner should issue a certificate of occupancy therefor in accordance with the provisions of the zoning ordinance, and ordered the building commissioner to issue the necessary building permits to complainant for structures to be used as aforesaid when plans and specifications therefor had been filed with him. After the decision of the board of appeals an amendment to the zoning ordinance was presented to the city council on January 6, 1925, eliminating from the ordinance the words "and temples," "libraries" and "schools and colleges," and inserting in lieu thereof the words, "public institutions having the right of condemnation under the laws of eminent domain." On the same day the proposed amendment was referred to the zoning commission of the city of Evanston and the zoning committee of the council, and a motion was carried in the council "that the council direct the building commissioner to take no further steps on the application for a 'use permit' by Western Theological Seminary in view of the possible change in the zoning ordinance." On January 8 certain property owners petitioned the board of appeals for a rehearing, and the petition was set for hearing on January 29, the order of the board to be held in abeyance during the interval. On that day a rehearing was held by the board of appeals. Evidence and arguments were presented by both sides, and on February 7 the board ordered that the order of December 30, 1924, reversing the action of the building commissioner be adhered to and be in full force and effect from that date. On February 12 the zoning commission conducted a hearing on the proposed amendment to the zoning ordinance, and on February 14

reported to the mayor and the council that it was the opinion of the commission that the adoption of the amendment as drawn would be unwise; that it would appear to be doubtful if a complete exclusion of all educational institutions from such districts would be a lawful exercise of the power delegated to municipalities under the zoning statute, and that such indiscriminate exclusion might invalidate the zoning ordinance and thus defeat the desire of the city council to properly protect the single-family dwelling area. Nevertheless, the council on March 31, 1925, adopted the amendment and it was approved on the next day by the mayor.

The complainant's leasehold interest was worth more than $150,000. The architect estimated the cost of the proposed buildings would be approximately $750,000, of which $400,000 had already been pledged. These pledges were all made for the erection of buildings on the leased premises. The passage of the ordinance has been widely published, reports have been widely circulated that the complainant will be unable to make use of these premises for the proposed buildings and doubt and uncertainty have been created in the mind of the public as to the complainant's right to do so, whereby it has become impracticable for the complainant to conduct its campaign to raise money for the proposed buildings until the validity of said ordinance has been determined, the entire program of the complainant to re-establish and re-build a seminary has been brought to a standstill, and its purpose to resume active conduct of the seminary has been retarded and rendered doubtful, so that no definite assurance can be given to students as to when its educational activities will be renewed.

Counsel for the appellee contend in maintenance of the decree that the original zoning ordinance prohibited the construction of such buildings as the appellant proposed to erect and the amendatory ordinance therefore does not affect the appellant; that the amendatory ordinance is not

arbitrary, unreasonable or discriminatory but is a valid exercise of the police power, and that equity has no jurisdiction because it will not declare an ordinance void in advance of any act of the complainant bringing itself within the terms of the ordinance, and because the complainant has an adequate remedy at law by appeal to the board of appeals.

There is no sound argument against the proposition that the right to erect and use buildings for schools and colleges includes all such buildings and such uses as ordinarily form a part of the buildings, equipment and plant of a college. The building commissioner held the proposed use not to be in conformity with "A" district restrictions, but the zoning board of appeals reversed this action and held that the buildings would not violate the zoning ordinance, and the zoning commission, to which the proposed amendment was submitted, was of the opinion that the amendment should not be adopted. Thus the administrative officers authorized by the law and designated by the ordinance for the enforcement of its terms have determined, so far as their decision is capable of doing so, that under the proper construction of the ordinance the proposed buildings on the appellant's premises will not violate the zoning ordinance. The appellee's argument is that hotels, lodging houses, boarding houses, tenement houses and fraternity houses are excluded by the ordinance from "A" residence districts though permitted in "B" districts. It then begs the whole question by the assumption that while the appellant could have erected a school or college on its property it could not have maintained large dormitories and dining rooms in an "A" residence district even though used in conjunction with its college, and that the right to build a college did not include the right to construct, maintain and use the students' dormitories and commons customarily appurtenant to a college. It is said that Northwestern University is in a "B" residence district, and its campus was

so classified as to permit the erection of dormitories and similar buildings thereon, and it was never contemplated that dormitories for students could be erected in an "A" residence district. This last statement is at variance with the language used, and is, of course, merely counsel's construction of that language. "Lodging," the noun, in its ordinary use refers to a temporary place of abode,—particularly sleeping quarters,—and "lodging house" to a house where lodgings are let for hire. "Dormitory" was originally a large sleeping room in a monastery, containing a number of beds for monks. For many years it has been customarily used in reference to a building or large room belonging to a school or college in which the students sleep and sometimes board and study. Its accommodations are not let for hire in the ordinary sense, or to transient guests, and are not a source of profit but are furnished to students, and the charge for tuition, room and board together constitute the charge of the college for the teaching and education of its students in its buildings and under its authority. A dormitory is no more a lodging house than it is a hotel, an apartment building, a tenement house or a club, and a student commons is no more a boarding house than it is a restaurant, a coffee house, a cafe or an ordinary. The words are in common use and are frequently met in print and speech. In ordinary usage they have no such meaning as counsel seek to fasten upon them,—at least we do not recall any such usage within our observation and counsel have not brought any instance of it to our attention. They cite the case of *Hillsdale College* v. *Rideout,* 46 N. W. (Mich.) 370, as defining a dormitory as "a room, suite of rooms or building used to sleep in; a bed-room, sleeping quarters or sleeping house; a lodging house," and say it describes not only a dormitory, but a lodging house, boarding house and apartment house. It describes, in a manner, many things; it defines nothing. Sleeping quarters might be a tent or a shed, a covered or uncovered

wagon, a truck or van, or a Pullman sleeper. The word "dormitories" may include them all. In *City of Chicago* v. *University of Chicago,* 228 Ill. 605, we had occasion to consider the relation of student dormitories and commons to the educational institutions to which they belonged, and we held that dormitories and dining halls were an essential part of universities and colleges, and the use of them was in the immediate carrying on of the educational purposes of universities. This view was sustained by the cases of *Yale University* v. *New Haven,* 71 Conn. 316, *Phillips Academy* v. *Andover,* 175 Mass. 118, and *Harvard College* v. *Cambridge Assessors,* id. 145, which were cited in support of it. The original ordinance clearly authorized the erection and maintenance by the appellant in the "A" residence district of the buildings for its college, including the dormitories and commons intended to be conducted as a part of the school and for its purposes.

The appellee invokes the doctrine of statutory construction that where there are two provisions, one of which is general and designed to apply to cases generally, and the other is particular and relating to one subject, the particular provision must prevail and be treated as an exception to the general provision. The rule has no application here. The provision of the ordinance authorizing the erection and use of buildings for schools and colleges in a residence district does not refer to the same subject as tenement houses, hotels, private clubs and fraternity houses, boarding and lodging houses, referred to in the provision of the ordinance with respect to a "B" residence district.

It may be worthy of note, though perhaps it may not control the construction of the ordinance, that at the time the ordinance was passed there were two institutions of learning in the "A" residence district not possessing the power of condemnation,—Roycemore School and a Swedish theological seminary, the latter of which had housed and boarded its students upon its premises for many years.

The act of 1921 authorizing the enactment of zoning ordinances by city councils was held valid in *City of Aurora* v. *Burns,* 319 Ill. 84, and the original zoning ordinance of the city of Evanston was also sustained in *Deynzer* v. *City of Evanston,* 319 Ill. 226. Before the passage of the original zoning ordinance in 1921 there was no restriction, so far as appears, which would prevent the owner of any property in the city of Evanston from establishing a school or college on its property, erecting and maintaining the usual school or college buildings and conducting the institution according to the usual manner, including the use of dormitories and commons. The zoning ordinance imposed no restriction but expressly recognized such right in an "A" residence district or any other district in the city. The appellant, upon its lease of part of block 84 and purchase of another part, had the right to use its property in a lawful manner in any lawful business. In fact, the only property which it acquired, so far as the leased premises were concerned, was the right to use them as a site for such educational buildings as might be necessary for carrying forward the work authorized by its charter and as might be used exclusively for educational purposes. The privilege of every citizen to use his property according to his own will is both a liberty and a property right. "Liberty" includes not only freedom from servitude or restraint, but also the right of every man to be free in the use of his powers and faculties, to pursue such occupation or business as he may choose, and to use his property in his own way and for his own purposes, subject only to the restraints necessary to secure the common welfare. (*Ruhstrat* v. *People,* 185 Ill. 133; *Frorer* v. *People,* 141 id. 171; *Haller Sign Works* v. *Physical Culture Training School,* 249 id. 436.) Both liberty and property are subject to the police power of the State, under which new burdens may be imposed on property and new restrictions placed on its use when the public welfare demands it. The police power is, however,

limited to enactments having reference to the public health, comfort, safety or welfare. An act which deprives a citizen of his liberty or property rights cannot be sustained under the police power unless a due regard for the public health, comfort, safety or welfare requires it. (*Ruhstrat* v. *People, supra; Bailey* v. *People,* 190 Ill. 28; *Bessette* v. *People,* 193 id. 334; *People* v. *City of Chicago,* 261 id. 16; *Catholic Bishop* v. *Village of Palos Park,* 286 id. 400.) The legislative determination as to what is a proper exercise of the police power is not conclusive. Whether the means employed have any real, substantial relation to the public health, comfort, safety or welfare, or are arbitrary and unreasonable, is a question which is subject to review by the courts, and in determining that question the courts will disregard mere forms and interfere for the protection of rights injuriously affected by arbitrary and unreasonable action. *City of Aurora* v. *Burns, supra.*

The original ordinance was a comprehensive zoning ordinance affecting all parts of the city and treating each section according to its own needs, present and prospective, and under it buildings of the character and for the purposes which the appellant desires to construct were authorized in the "A" residence district. The appellant, relying on the ordinance, acquired the right in the premises which it leased, to construct buildings such as were authorized by the ordinance to be used for the purposes authorized. Every right which the appellant acquired by its lease would have been destroyed by the amendment, which excluded every kind of school and college from the district, regardless of the type of the structure, the size of the buildings, their conformity to the zoning regulations or the number of prospective students of the school. After the city council had had the entire subject under long and thorough consideration it adopted the zoning ordinance, which regulated in great detail the uses to which the various parcels of real estate in the city might be put, the height of the buildings

which might be erected in the different parts of the city, the part of the area of lots which might be occupied by buildings and the part required to be left unoccupied, and the area of yards; courts and other open spaces within and about the buildings to be thereafter erected. This ordinance was then considered sufficient to protect the public welfare of the community, and this was the condition under which the appellant acquired its rights in property within the "A" residence district. Neither the city council nor the legislature is authorized, under the power of the constitution, to take away or limit the appellant's right to make any use of the property which was lawful at the time it acquired it, except in such ways as may be necessary for the public health, comfort, safety or welfare. So far as the property which the appellant acquired relying on the validity of the ordinance permitting its use for schools and colleges is concerned, the amendment, by depriving it of the right to make such use,—which is the destruction of the only property it acquired,—is unreasonable and arbitrary.

In *Dobbins* v. *Los Angeles,* 195 U. S. 223, the city council of the city of Los Angeles had adopted an ordinance making it unlawful to erect and maintain gas works outside of a certain district described in the ordinance. Afterward Caroline W. Dobbins purchased land within the limits of the district fixed by the ordinance and contracted for the erection of gas works upon those premises. Thereupon the city council passed a second ordinance, amending the first by limiting the boundaries of the territory within which the erection of gas works was permitted so as to exclude the premises of the plaintiff in error. The construction of the works was prosecuted after the passage of the second ordinance until the city caused the employees engaged in the erection of the gas works to be arrested for a violation of the city ordinance and made repeated arrests. The owner of the property then filed a bill for an injunction to restrain the enforcement of the amended ordinance.

The court, while granting the right of the city, even after the erection of the works, to prohibit, for the protection of the public health and safety, their maintenance and continuance, held that the exercise of the power was subject to judicial review and property rights could not be wrongfully destroyed by arbitrary enactment. It was averred in the bill that the works would be so constructed as not to interfere with the health or safety of the people, and no reasonable explanation for the arbitrary exercise of power was suggested. The court held that where the facts as to the situation and conditions are such as to establish the exercise of the police power in such manner as to oppress or discriminate against a class or an individual the courts may consider and give weight to such purpose in considering the validity of the ordinance. It was said: "In this case we think the allegations of the bill disclose such character of territory, such sudden and unexplained change of its limits after the plaintiff in error had purchased the property and gone forward with the erection of the works, as to bring it within that class of cases wherein the court may restrain the arbitrary and discriminatory exercise of the police power which amounts to a taking of property without due process of law and an impairment of property rights protected by the fourteenth amendment to the Federal constitution."

This language is applicable to the case we have here. The appellant proposes to construct its buildings in full compliance with all the requirements of the zoning ordinance and of the building ordinances of the city. In height, density of occupation, set-back from the streets, area of land occupied and character of construction, the appellant's buildings will meet all requirements imposed for buildings erected in the "A" residence district. The erection and use of buildings for schools and colleges were not considered detrimental to the public health or safety, or dangerous to the public comfort or general welfare, when the original ordinance was passed. It was not so considered by the

zoning commission when the amendatory ordinance was passed. There seems no reasonable ground for apprehension that with a strict compliance with all the provisions of the zoning ordinance and the building ordinances of the city the construction and maintenance of a theological seminary in the "A" district would be a menace to the morals, health, comfort, safety or general welfare of the people of the city of Evanston. The question of the right of the city to exclude from the "A" district schools and colleges in the first instance does not call for decision. They were not excluded until after the appellant, relying upon the terms of the ordinance, invested its funds in acquiring the right which the ordinance expressly permitted to be exercised. The destruction of that right when there is no appreciable danger to the public health, comfort, safety or welfare to be feared from its exercise is clearly an arbitrary and unreasonable exercise of power which renders the amending ordinance void as to the appellant's property.

The appellee contends that equity will not enjoin the enforcement of an ordinance on the ground of its invalidity before the person seeking such relief has done some act to bring himself within the operation of the ordinance or where the defendant has an adequate remedy at law. The general proposition must be conceded that equity will not enjoin the enforcement of a void ordinance on the ground, alone, of its invalidity or of apprehension in regard to what may be done under it but the complainant must actually suffer some wrong from it. This objection was made in the case of *Village of Euclid* v. *Ambler Realty Co.* decided by the Supreme Court of the United States on November 26, 1926, Adv. Op. 71 L. ed. 171. The complainant was the owner of a tract of vacant land containing sixty-eight acres, situated in the village. The village council on November 13, 1922, adopted a comprehensive zoning ordinance dividing all the territory of the village into

classes with reference to uses, to the height of buildings
and to the area of lots, the proportion to be occupied by
buildings, the width of front, side and rear yards, and other
particulars. The complainant's land was classified in dis-
tricts U-2, U-3 and U-6, in the first of which the uses per-
mitted include two-family dwellings in addition to the uses
included in U-1, which are single-family dwellings, public
parks, water towers and reservoirs, suburban and inter-
urban electric railway passenger stations and rights of
way, and farming, non-commercial greenhouse nurseries,
and truck gardening. The uses of U-2 do not include
apartment houses, hotels, churches, schools or other public
and semi-public buildings. U-3 includes all these uses, but
excludes banks, theaters, retail stores and shops and a long
list of other uses. The bill alleged that the land had been
held for years for the purpose of sale and development for
industrial uses, for which it was especially adapted and for
such uses had a market value of $10,000 an acre, but if
the use is limited to residential purposes the market value
does not exceed $2500 an acre; that the first 200 feet north
of Euclid avenue, which is the south boundary of the tract
and is included in district U-2, has a value of $150 a front
foot if unrestricted in respect to use, but if restricted to
residential uses its value does not exceed $50 a front foot.
The bill averred that the ordinance attempted to restrict
and control the lawful uses of the complainant's land so
as to confiscate and destroy a great part of its value, and
that prospective buyers are deterred from purchasing any
part of the land because of the existence of the ordinance
and the necessity thereby entailed of burdensome and ex-
pensive litigation to vindicate the right to use the land for
lawful purposes; that the ordinance constitutes a cloud
upon the land and reduces and destroys its value. A mo-
tion was made in the district court to dismiss the bill on
the ground that because the complainant had made no ef-
fort to obtain a building permit or apply to the zoning

board of appeals for relief, as it might have done under the ordinance, the suit was premature. The Supreme Court, in holding that this motion was properly overruled, used this language: "The effect of the allegations of the bill is that the ordinance of its own force operates greatly to reduce the value of appellee's lands and destroy their marketability for industrial, commercial and residential uses, and the attack is directed, not against any specific provision or provisions but against the ordinance as an entirety. Assuming the premises, the existence and maintenance of the ordinance in effect constitutes a present invasion of appellee's property rights and a threat to continue it. Under these circumstances the equitable jurisdiction is clear." *Terrace* v. *Thompson,* 263 U. S. 197, and *Pierce* v. *Society of Sisters,* 268 id. 510, were cited in support of this conclusion. The first case was a suit to enjoin the Attorney General of the State of Washington from enforcing the provisions of the Anti-alien Land law of the State, which prohibited the ownership of land by aliens and provided that an alien should not take or have any title or right to any benefit of any land, and that land conveyed to or for the use of aliens should thereby be forfeited to the State. A land owner desired to lease a tract of land which he owned for five years to a Japanese subject who was a capable farmer and desired to accept the lease, but the penalties of the act were so great that the parties would not make the lease even to test the validity of the law, which was alleged to be in conflict with the due process and equal protection clauses of the constitution, but would be compelled to submit to it whether valid or invalid and thus be deprived of their property without due process of law and denied the protection of the laws unless the court would determine the question of the validity of the law. It was held that the legal remedy which will oust equity jurisdiction must be as complete, practical and efficient as that which equity can afford; that equity jurisdiction will be

exercised to enjoin the threatened enforcement of a State law which contravenes the Federal constitution wherever it is essential, in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable, and that complainants were not obliged to take the risk of prosecution, fines and imprisonment and loss of property in order to secure an adjudication of their rights. The other case cited sustains a bill in equity to enjoin the enforcement of the Compulsory Education act of the State of Oregon, requiring that all children between the ages of six and sixteen years be sent to a public school for the period of time a public school shall be held during the current year. The complainants were corporations engaged in conducting schools which were attended by many children between the ages of six and sixteen years. It was evident that the manifest purpose of the act was to compel the general attendance of children at public schools, and that the inevitable result of its enforcement would be the destruction of the complainants' primary schools. It was said that the complainants' business and property were threatened with destruction through the unwarranted compulsion exercised over present and prospective patrons by reason of the act, and the prevention of impending injury was a well recognized function of courts of equity.

The amendatory ordinance, according to the allegations of the bill, was an arbitrary and unreasonable exercise of power in respect to the property of the appellant. It is void as to such property, but its existence is a cloud upon the appellant's title, is immediately destructive of its value, and therefore constitutes a present invasion of the appellant's rights and a threat to continue such invasion. The demurrer to the bill should have been overruled.

The decree is reversed and the cause remanded, with directions to overrule the demurrer to the bill.

*Reversed and remanded, with directions.*