STATE OF NEVADA, Ex Rel. the ROMAN CATHOLIC BISHOP OF RENO and His Successors, a Corporation Sole, THOMAS K. GORMAN, FRED GREULICH, and MRS. GURNEY GORDON, Petitioners, *v.* CHARLES L. HILL, as City Engineer and Ex Officio Inspector of Buildings of the City of Reno, County of Washoe, State of Nevada, Respondent.

No. 3268

May 8, 1939.                    90 P. (2d) 217.

*M. A. Diskin* and *William S. Boyle,* for Petitioners:

*Douglas A. Busey,* City Attorney of Reno, for Respondent:

# OPINION

*Per Curiam:*

In this proceeding petitioners challenge the validity of sections 7 and 8 of ordinance No. 433 (the zoning ordinance) of the city of Reno, upon the ground that they infringe sections 1, 4 and 8 of article I of the constitution of Nevada, and the fourteenth amendment of the constitution of the United States, U. S. C. A.

Section 7 of said zoning ordinance reads as follows: "It shall be unlawful for any person, firm, association or corporation to erect, build, alter, or enlarge any building or structure in the Residential District, not intended for residential purposes, except sheds which may be erected in the rear of any lot, except as hereinafter provided."

Prior to January 1, 1939, section 8 of said ordinance read: "Any person, firm, association or corporation desiring to build, enlarge, alter or build upon any structure in the Residential District, shall first submit the plans of the same to the Building Inspector of the City of Reno, and if said building or structure is to be used for any other purpose than a dwelling or apartment house, the person, firm, association or corporation intending to construct, alter or enlarge the same shall first obtain the written permission of seventy-five (75%) percent of the owners of property in the block in which said building is to be constructed, altered or enlarged, and of the owners of property in the adjacent blocks facing on the street upon which said building will face, within a distance of 500 feet of said building, and shall obtain in addition thereto, the approval of the Building Inspector of the City of Reno, as to the construction of said building, provided, however, that in the event said person, firm, association or corporation is unable to obtain a written permission of the property owners as hereinbefore provided, the said person, firm, association or corporation intending to construct said building may submit the plans therefor, to the City Council, together

with a statement as to what purpose said structure is to be used, and the City Council by a majority vote may grant a permit for the construction of said building or the enlarging or alteration of the same over the protest of the property owners, if in their judgment the protest or refusal of permission was unreasonable."

An amendment to said section 8 was introduced in the city council on December 13, 1938, passed December 27, 1938, and became effective January 1, 1939. The amended section is as follows: "A permit may be issued for the erection or building in the residential district of a building or structure for purposes other than residential purposes, or for the alteration, enlargement or conversion of a building or structure in such district for or to such purposes other than residential purposes, provided that there be filed with any application for such permit written consents thereto signed by the owners, or legal representatives of the owners, of three-fourths of the land in the block in which such building or structure is to be erected, built, altered, enlarged or converted, and of the land in the adjacent blocks facing upon the street upon which such building will face within a distance of 500 feet thereof. Provided further that if such written consents are filed with such an application then the Council may by a majority vote grant or deny the application, but if such written consents are not filed with such an application then a five-sixths vote of the members elected to the City Council shall be required to grant the application."

On July 25, 1938, the bishop made application to the city council, pursuant to section 8 of ordinance No. 433, for permission to construct a church on certain lots in the residential district of the city as defined by said ordinance. The application was not supported by the written permission of seventy-five percent of the property owners within the distance specified in section 8 of the ordinance. It was opposed by a protest signed by a majority of the property owners within such distance.

This application was rejected by the city council on August 22, 1938.

On December 20, 1938, the bishop made written application to the city engineer for a permit to construct a church upon certain lots in the residential district as defined by city ordinance No. 433. This application was made under section 9 of ordinance No. 434, known as the building ordinance. It was denied by the city engineer on the ground that by reason of sections 7 and 8 of city ordinance No. 433, he was without right, power or authority to issue the permit. Both of the applications for building permits were made before section 8 of the zoning ordinance was amended. The petition for a writ of mandamus herein was filed December 22, 1938. Respondent filed its answer on February 6, 1939, and on the same day there was filed a stipulation and agreed statement of facts, to which is attached a map showing the proposed site of the church and the near-by surroundings. From the petition, the answer and the agreed statement of facts it appears that the one Roman Catholic church in Reno is inadequate to meet the needs of its communicants, that a second parish has been established, and that the proposed church would be built to accommodate not less than three hundred families resident therein. The site is the most convenient for serving the needs of said parishioners.

The application filed as aforesaid by the bishop on December 20, 1938, under section 9 of the building ordinance, contained a statement as to the location of the proposed building, and gave the name and resident address of the actual owner of the land "and of the building or structure," and the name and residence address of the architect or designer. The required fee was tendered, and a complete set of plans and specifications, showing clearly all parts of the proposed structure, including a plan of each floor. Said application, plans and specifications contained a full and complete statement of the facts required by said building ordinance, and embodied all requirements required by law

or ordinance in such cases. Under section 10 of said building ordinance it is made the duty of respondent to grant and issue the permit applied for, and said ordinance is, and at all times mentioned in the petition was, in full force and effect.

By the Reno zoning ordinance the city is divided into a business district, an industrial district and a residential district, "for the purpose of promoting the health, safety, morals, convenience, property and general welfare of the community." The site of the proposed church is in the residential district.

Many members attending the only Roman Catholic church now in Reno have their homes and places of residence from five to ten miles distant therefrom. No point of the city limits is more than one and three-quarters miles from said church. Should the proposed new church be built, the distance any person would have to travel to attend a Roman Catholic church in Reno would be lessened at the most by approximately three-quarters of a mile.

The site of the proposed new church building is in block 4 of Reinmiller's subdivision. The bishop became the owner of six lots in said block on September 14, 1938, and on the same date secured an option for the purchase of four more lots therein. Said option had not been exercised when the stipulation and agreed statement of facts was filed herein. The proposed church would be built at a cost of approximately eighteen thousand dollars.

Nothing has been done in the way of construction work to erect a church on the proposed site at the corner of Wright street and Walker avenue. The lots now stand in an unimproved condition. If the proposed church is erected on these lots, masses will be conducted there on Sundays, and there will be church meetings. Weddings will be held at such church, and funerals will also be conducted at, to, and from such church. There will also be a church bell used in connection with the regular activities of the church. The map attached to

the agreed statement of facts shows that the site of the proposed church is just across Lander street from the Billinghurst junior high school and playground. There are many dwellings situated in close proximity to the lots where the church is proposed to be built.

Section 1 of the "Zoning Act" (Statutes of Nevada 1923, chap. 125, pp. 218–220, N. C. L. 1929, secs. 1274–1280) provides that: "For the purpose of promoting the health, safety, morals, convenience, property or general welfare of the community, the city council * * * may, by ordinance, regulate and restrict the height, number of stories and size of buildings, and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the location and use of buildings, structures and land for trade, industry, residence or other purposes, and establish lines designating the distance at which buildings shall be erected from the property line of any lot or lots in the said city."

Section 2 of said act reads: "For any and all of said purposes, the city council may, by ordinance, divide the city into districts of such number, shape and area as may be deemed suitable to carry out the purposes of this act; and within districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. All such regulations shall be reasonable and uniform for each class or kind of buildings throughout each district and for the kind and class of business or industry carried on in each district, but the regulations in one district may differ from those in other districts."

The city of Reno was incorporated by an act of the legislature in the year 1903. Statutes of Nevada, chap. CII, pp. 184–198. Said act has been amended from time to time. Section 10j of article XII of said act, as last amended (Statutes of Nevada 1937, chap. 204, sec. 20, pp. 452–455), reads as follows: "The city council, among other things shall have power: * * * Tenth: * * * To regulate the types of structures or buildings

which may be constructed in specified districts of the city to be designated by the city council. For any and all of said purposes, the city council may, by ordinance, divide the city into districts of such number, shape and area as may be deemed suitable to carry out the purposes of this subdivision; and within districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. All such regulations shall be reasonable and uniform for each class or kind of buildings throughout each district and for the kind and class of business or industry carried on in each district, but the regulations in one district may differ from those in other districts. All regulations shall be made in accordance with a comprehensive plan, and designed to lessen congestion in the streets, to secure safety from fire, panic and other dangers; to protect property and promote the health, safety and general welfare; to provide adequate light and air; to prevent the overcrowding of land; and to conserve the value of the buildings and structures in said district. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout said city."

Sections 1 and 4 of article I of the state constitution are as follows:

Section 1. "All men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness."

Section 4. "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state; and no person shall be rendered incompetent to be a witness on account of his opinions on matters of his religious belief; but the liberty of conscience hereby secured shall

not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state."

The due process provision in section 8 of article I of the state constitution is identical with that in the fourteenth amendment of the constitution of the United States, U. S. C. A.

The validity of sections 7 and 8 of the zoning ordinance has been challenged on several grounds, but we have found it necessary to consider but one. The great weight of authority convinces us that these sections, as applied to the property involved in this case, bear no substantial relationship to the promotion of the health, safety, morals, convenience, property, or general welfare of the city of Reno, or of its residential district, and that they constitute an invasion of the property rights of petitioner corporation. Roman Catholic Archbishop v. Baker, 140 Or. 600, 15 P. (2d) 391; Village of University Heights v. Cleveland Jewish Orphans' Home, 6 Cir., 20 F. (2d) 743; Women's Kansas City St. Andrew Soc. v. Kansas City, Mo., 8 Cir., 58 F. (2d) 593; Western Theological Seminary v. Evanston, 325 Ill. 511, 156 N. E. 778; City of Miami Beach v. State, 128 Fla. 750, 175 So. 537; State of Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210, 86 A. L. R. 654. As against these authorities, cases involving livery stables, garages, gasoline stations, funeral parlors, billboards, two-family residences, morgues, laundries, etc., afford us little aid in the instant case. The law distinguishes between such cases and those relating to churches, schools, parks and playgrounds, art galleries, library buildings, community center buildings, etc. In some, if not most zoning ordinances, churches are expressly classified in first residence districts. See Women's Kansas City St. Andrews Soc. v. Kansas City, Mo., supra; State of Washington ex rel. Seattle Title Trust Co. v. Roberge, supra; Western Theological Seminary v. Evanston, supra.

In Village of University Heights v. Cleveland Jewish

Orphans' Home, supra, the circuit court of appeals, sixth circuit, in the course of a unanimous decision, said [20 F. (2d) 745] : "The structural plans of the proposed orphanage comply with all the requirements of the village. There is no objection to the buildings per se, but only to the use of them as a home for a large number of children. If they were intended for a private school, or for private residences, their use as such would not and could not be prohibited. The question is whether the proposed use is so different in character from concededly legitimate uses as to bring it within the scope of the police power of the municipality. That power has been held, as we have seen, to include the right generally to exclude business houses, stores, shops, and apartment houses from strictly residential districts. It has never been held to include the right to prohibit the use for orphan children of cottages built according to the requirements of the municipality. We can see many valid reasons, affecting the public welfare, which would justify the exclusion of factories, business houses, shops, and even apartment houses from strictly residential districts, but which would not apply to the use of structurally proper cottages for an orphanage; and while an orphanage would no doubt be less agreeable to the community in some respects than a private school or private residences, we are unwilling to hold that it is within the power of the village to prohibit the use of cottages of this character for that purpose."

In Women's Kansas City St. Andrew Soc. v. Kansas City, Mo., supra, which concerned a philanthropic old ladies' home, the circuit court of appeals, eight circuit, said in part [58 F. (2d) 597] : "The chief objection to plaintiff's coming into the neighborhood seems to have come from the residents of the Rockhill district, and from the trustees of the various trusts connected with the William Rockhill Nelson Art Gallery. * * * The owner of the adjoining duplexes testified that having an old ladies' home as an immediate neighbor would diminish the value of his property, and it would affect

his morals 'to have it referred to as the old ladies' home next door.' * * * Zoning laws rest upon the police power of the states, and, when they are fairly within the well-recognized bounds of such power they are valid, even though they may entail some hardship upon property owners. While such police power is broad, there are limitations to its exercise, which the courts have not attempted to accurately define. However, restrictions by zoning ordinances imposed upon the use of one's property to be valid must bear some 'substantial relationship to the public health, safety, morals or general welfare.' The reserved police power of the state must stop when it encroaches on the protection accorded the citizen by the Federal Constitution. * * * Certainly the fact that aged people may have a depressing effect on some people is not sufficient to exclude such people from a district. There is no limit to the causes that may depress people, but they do not furnish a basis for the support of a restriction as to use of one's property. What was said by the Texas court in Spann v. City of Dallas et al., 111 Tex. 350, 235 S. W. 513, 516, 19 A.L.R. 1387, with respect to the noise and annoyance incident to the operation of a grocery store in a residential district, would apply a fortiori to the so-called 'depressing influence' of elderly residents, viz.: 'It could disturb or impair the comfort of only highly sensitive persons. But laws are not made to suit the acute sensibilities of such persons. It is with common humanity—the average of the people, that police laws must deal. A lawful and ordinary use of property is not to be prohibited because repugnant to the sentiments of a particular class.' * * * There must be limits as to what even a general plan may do, and the mere comprehensiveness of the zoning ordinance is in itself no justification for each separate restriction that the ordinance imposes. * * * If the restriction here complained of does in fact, however, have no relationship to the fundamentals upon which zoning statutes can be sustained, viz. public health, safety, moral, and general welfare, and is not

essential to a general zoning ordinance based on these considerations, then the courts should not hesitate to protect plaintiff from being deprived of the use of its property under the guise of police power. * * * Our conclusion is that the restriction upon the use of plaintiff's property is not an essential of the general zoning plan, and is in its application to plaintiff's property so arbitrary and unreasonable as to be void."

Western Theological Seminary v. Evanston, supra, as the title implies, concerned a theological seminary. Part of the opinion in that case reads as follows [325 Ill. 511, 156 N. E. 783] : "Both liberty and property are subject to the police power of the state, under which new burdens may be imposed on property and new restrictions placed on its use when the public welfare demands it. The police power is, however, limited to enactments having reference to the public health, comfort, safety, or welfare. An act which deprives a citizen of his liberty or property rights cannot be sustained under the police power unless a due regard for the public health, comfort, safety, or welfare requires it. Ruhstrat v. People, supra [185 Ill. 133, 57 N. E. 41, 49 L. R. A. 181, 76 Am. St. Rep. 30] ; Bailey v. People, 190 Ill. 28, 60 N. E. 98, 54 L. R. A. 838, 83 Am. St. Rep. 116 ; Bessette v. People, 193 Ill. 334, 62 N. E. 215, 56 L. R. A. 558; People v. City of Chicago, 261 Ill. 16, 103 N. E. 609, 49 L. R. A., N. S., 438, Ann. Cas. 1915A, 292; Catholic Bishop v. Village of Palos Park, 286 Ill. 400, 121 N. E. 561. The legislative determination as to what is a proper exercise of the police power is not conclusive. Whether the means employed have any real, substantial relation to the public health, comfort, safety, or welfare, or are arbitrary and unreasonable, is a question which is subject to review by the courts, and in determining that question the courts will disregard mere forms and interfere for the protection of rights injuriously affected by arbitrary and unreasonable action. City of Aurora v. Burns, supra [319 Ill. 84, 149 N. E. 784]."

A home for aged poor was the subject matter of State of Washington ex rel. Seattle Title Trust Co. v. Roberge, supra. In the opinion of the court in that case, we find the following [278 U. S. 116, 49 S. Ct. 51] : "Zoning measures must find their justification in the police power exerted in the interest of the public. Euclid v. Ambler Realty Co., supra [272 U. S. 365], 387 (47 S. Ct. [114] 118 [71 L. Ed. [303], 310, 54 A. L. R. 1016]). 'The governmental power to interfere by zoning regulations with the general rights of the landowner by restricting the character of his use, is not unlimited and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare.' Nectow v. Cambridge, supra [277 U. S. 183], page 188 (48 S. Ct. [447], 448 [72 L. Ed. 842, 844]). Legislatures may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities. * * * It is not suggested that the proposed new home for aged poor would be a nuisance. We find nothing in the record reasonably tending to show that its construction or maintenance is liable to work any injury, inconvenience or annoyance to the community, the district or any person. The facts shown clearly distinguish the proposed building and use from such billboards or other uses which by reason of their nature are liable to be offensive."

In City of Miami Beach v. State, supra, the supreme court of Florida was called upon to consider the validity of an ordinance prohibiting private schools in a multiple family district while permitting public schools. The ordinance was held invalid because "it appears to be arbitrary and unreasonable and has no relation to the public safety, health, morals, comfort, or general welfare." [128 Fla. 750, 175 So. 539.]

In Roman Catholic Archbishop v. Baker, supra, the property in controversy was a proposed parochial grade

school. In that case one of the claims advanced by the city officials was that the proposed school site was in a high class residential district in which many of the residents had expended large sums of money in improving and beautifying their property; that the erection of a school on the site in question would lessen the value of the property of many of the adjacent property owners, many of whom had bought their property and built mansions thereon for homes, after the passage of the ordinance, and had spent large sums of money in making lawns and setting out shrubbery. Notwithstanding this and other arguments put forward in support of the ordinance, it was held invalid, the court saying, inter alia [140 Or. 600, 15 P. (2d) 395] : "The right to own property is an inherent right, one of those rights with which men 'are endowed by their Creator.' This right of ownership is subject to the superior rights of the public to appropriate such property for certain public uses on payment of just compensation. The right to own carries with it the right to use that property in any manner that the owner may desire so long as such use will not impair the public health, peace, safety, or general welfare. The kind of school proposed to be erected will not interfere with the public health; it cannot affect the public peace; it surely will not endanger the public safety; and by all civilized peoples, an educational institution, whose curriculum complies with the state law, is considered an aid to the general welfare. These propositions cannot be successfully disputed. It is not a question alone of what monetary damage plaintiff may sustain, but also a question of the invasion of one of plaintiff's inherent rights. * * * Under the ordinance, the plaintiff could not buy a tract of land in any residential district in the city of Portland and know at the time of the purchase whether a building for school purposes might be erected thereon. There are no specifications in the ordinance as to how or where a site for a school may be located, prior to the action of the city council. Its location would be a matter

entirely within the arbitrary power of the city council, the city planning commission, or 50 percent of the property owners in a district of which the boundaries are arbitrarily fixed by the ordinance, and that power might be exercised or not at the whim or caprice of these bodies."

■ Respondent urges that funerals at the proposed new church would have a depressing effect on near-by residents; but it is a matter of common knowledge that funeral services are frequently conducted in the finest as well as the less pretentious private homes in the residential district of the city of Reno. Death is a part of our existence, and is as natural as life. We are unable to perceive why a church funeral service, reverently conducted as such services uniformly are, should have a more depressing effect on normal persons than one held at a private residence.

Petitioners and respondent differ as to whether section 8 of the zoning ordinance, as amended, is material, in view of the fact that the application for building permit was made before the amendment; but this question need not be decided because, amended or unamended, said section is unconstitutional with reference to the instant case.

So, too, it is immaterial whether the challenged sections be regarded as having been enacted pursuant to the Nevada zoning act or amended section 10j of article XII of the Reno incorporation act, particularly in view of the wording of section 1 of the Reno zoning ordinance, which reads: "For the purpose of promoting the health, safety, morals, convenience, property and general welfare of the community, the City of Reno is hereby divided into three districts to be known as Business District, Industrial District, and Residential District."

■■ It is to be borne in mind that we do not hold sections 7 and 8 of the zoning ordinance invalid in their general scope or aspects, but only as applied to the building of the proposed church in the residential district

of Reno. Village of University Heights v. Cleveland Jewish Orphans' Home, supra; Women's Kansas City St. Andrew Soc. v. Kansas City, Mo., supra; Roman Catholic Archbishop v. Baker, supra; State of Washington ex rel. Seattle Title Trust Co. v. Roberge, supra. Each case involving the constitutionality of zoning laws must be determined on its own facts as they appear in the record before the court. 3 McQuillin, Municipal Corporations, p. 350, sec. 1043; Harvard Law Review, vol. 37, pp. 856, 857.

The refusal of the city engineer of Reno to grant a building permit to the bishop pursuant to the latter's application of December 20, 1938, was based on said sections 7 and 8 of the Reno zoning ordinance, being city ordinance No. 433. The court holds these sections invalid with reference to said application, because they violate the due process provisions of both the constitution of the United States and the constitution of the State of Nevada.

It is ordered and adjudged that peremptory mandate be, and the same is hereby, awarded petitioners herein.

COLEMAN, J., died before the foregoing opinion was written.

ORR, J., did not participate in the hearing or consideration of this case.