BOARD OF ZONING APPEALS OF CITY OF INDIANÁPOLÍS
ET AL. *v.* WHEATON ET AL.

[No. 17,682.   Filed January 9, 1948.]

*Arch N. Bobbitt,* Corporation Counsel of City of Indianapolis, *Henry B. Krug,* City Attorney, and *Harry M. Steele,* Assistant City Attorney for Indianapolis, *Grahill* and *Baker,* of Indianapolis, attorneys for appellants.

*Barnes, Hickam, Pantzer,* and *Boyd* and *Lester Irons,* of Indianapolis, attorney for appellees.

HAMILTON, J.—This is an action instituted by the appellees, on behalf of themselves and all other resident property owners similarly situated, against the appellants in the Superior Court of Marion County, Room 5, for a writ of certiorari pursuant to the provisions of § 48-2305, Burns' 1933, to review the decision of the Board of Zoning Appeals of the City of Indianapolis in granting appellant, Most Reverend Paul C. Schulte, Archbishop of Indianapolis, a permit to build a combination unit, or project, consisting of a Catholic Church, priests' mansion, a convent, or sisters' home,

school, and off-street parking facility on the vacant ground located at 301 to 359 East 57th Street, Indianapolis, Indiana.

Appellees' petition alleged that the decision of the Board of Zoning Appeals in granting such permit was illegal. The court decided that the decision of the Board of Zoning Appeals was legal in all respects and should be sustained and affirmed in whole, except that it should be modified to the extent that the grade school building may be erected and used as such providing no living quarters are maintained in connection therewith and permission to construct said "sisters' residence" be denied. The court found that the building designated as the "sisters' residence" in connection with the school would be in violation of the general zoning ordinance, as amended.

The only question presented for our consideration is the correctness of the trial court's decision in modifying the decision of the Board of Zoning Appeals so as to forbid the erection of the sisters' home as a component part of the proposed unit project above described.

Section 1 and § 2 of the General Ordinance No. 75, duly enacted by the common council of the city of Indianapolis, amended §§ 2 and 3 of General Ordinance No. 114, enacted in 1922, to read in part as follows:

"Section 1. That Group 1—Residence Classes of § 2 of General Ordinance No. 114, 1922 (as amended), be and the same is hereby amended to read as follows:

"Group 1—Residence Classes,

"Class U-1 Uses: (Dwelling Houses),

"(1) Dwelling,

"(2) Church,

"(3) Grade or high school with no living quar-

ters maintained and not operated for pecuniary profit; . . . community center building."

"Section 2. That § 3 of General Ordinance No. 114, 1922 (as amended), be and the same is hereby amended to read as follows:

"Section 3. Dwelling House District (a) In a Class U-1 or dwelling house district, no building or premises shall be used, and no building shall be erected, altered or used which is arranged, intended or designed to be used for other than a U-1 use. (b) In a dwelling house district no building shall be erected, altered or used which is arranged, intended or designed for a use enumerated in subdivisions (2), (3), (4) or (5) of Class U-1 uses, unless such building is located: . . .

"(3) On a lot determined by the Board of Zoning Appeals after public notice and hearing to be so located that such building will, in the judgment of said board, substantially serve the public convenience and welfare, and will not substantially or permanently injure the appropriate use of neighboring property."

Other pertinent provisions of the zoning ordinance and statute read in part as follows:

"Section 22. Enforcement. Board of Zoning Appeals. The City Plan Commission is hereby constituted a Board of Zoning Appeals for the purpose of this ordinance. . . . Where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the provisions of this ordinance, the Board of Zoning Appeals shall have the power in a specific case to vary any such provision in harmony with the general purpose and intent so that the public health, safety and general welfare may be secured and substantial justice done."

"Section 23. District Exceptions. The Board of Zoning Appeals may in a specific case, after public notice and hearing and subject to appropriate conditions and safeguards, determine and vary the application of the district regulations herein estab-

lished in harmony with their general purpose and intent as follows: . . .

"(3) Permit in a district any use or building deemed by the Board to be in general keeping with and appropriate to the uses or buildings authorized in such district or existing on neighboring property. . . .

"(6) Permit in a dwelling house or apartment house district the location on any lot, lots or tract . . . bounded on at least three sides by streets not less than 40 feet in width of any use authorized in a business district provided such use in such location is so conditioned and restricted as to adequately safeguard the appropriate use of neighborhood property."

Section 48-2304, Burns' 1933, provides for the creation of the Board of Zoning Appeals, defines its duties and procedure upon appeal. Said section contains the following language:

"Such board of zoning appeals shall hear and determine appeals from and review any order, requirement, decision or determination, made by an administrative official or board charged with the enforcement of any ordinance or regulation adopted pursuant to this act, and shall permit and authorize exceptions to and variations from the district regulations in the classes of cases or in particular situations specified in such ordinance, and they shall hear and try all matters referred to them or upon which they are required to pass under any such ordinance of the common council adopted pursuant to this act. . . .

"Where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of such ordinance, the board of zoning appeals shall have power, in passing upon appeals, or petitions for variance from district regulations to vary or modify any of the rules, regulations or provisions of such ordinance so that the spirit of the ordinance shall be observed, public welfare secured or substantial justice done."

The application for a variation from the requirements of the zoning ordinance was filed on the 25th day of January, 1946. After notice duly given and served as required by ordinance and the rules of procedure of the Board of Zoning Appeals, a public hearing was held on February 4, 1946, and at the conclusion thereof, the board made the following finding and decision, to-wit:

"The Board, being fully advised in the matter, finds that these proposed improvements will substantially serve the public convenience and welfare and will not substantially or permanently injure the appropriate use of neighboring property, and therefore, approves the petition, subject to the following provisions:

"All construction must be in accordance with the plans on file in this office and subject to all provisions of the Building Code.

"The parking area shall be treated with a dust palliative."

It is well settled law in this state that the power and discretion to vary the provisions of the zoning ordinance rest in the sound discretion of the Board of Zoning Appeals which is the administrative agency created by the legislature for the purpose of administering the zoning law, and that this discretionary power of the board is not subject to review by a court, except upon the ground of illegality in whole or in part. *Board of Zoning Appeals* v. *Moyer* (1940), 108 Ind. App. 198, 208, 27 N. E. 2d 905, 909; *Board of Zoning Appeals* v. *Waintrup* (1935), 99 Ind. App. 576, 584, 193 N. E. 701; *Keeling* v. *Board of Zoning Appeals* (1946), 117 Ind. App. 314, 69 N. E. 2d 613, 617.

Furthermore, our Supreme Court has said that courts will not assume the duties of ministerial fact finding

bodies but will only intervene where the ministerial officer or board has acted unlawfully, arbitrarily, or unreasonably. *Smith* v. *Lippman* (1944), 222 Ind. 261, 53 N. E. 2d 157.

Tested by the foregoing rules, did the trial court err in holding that subsection (3) of § 1 of General Ordinance No. 75 must be construed literally, and when so construed, it forbids the building of a "convent," or "sisters' home" as a component part of a Catholic Church and school unit in a district classified by such zoning ordinance as a "residential district" for the reason that such "sisters' home" constitutes living quarters maintained in connection with a school?

The undisputed testimony in the trial court was to the effect that it is the plan of the Catholic Church to take care of the needs of both body and soul of individuals and that since the beginning of the Church in the United States, when a Catholic Church was established, a school was also established as soon as possible; that there were 24 Catholic Churches and schools in the city of Indianapolis and that in each instance with one exception, wherever there was a church, there was also a school. The evidence further showed that the church and school unit invariably consisted of a church, school, priests' mansion, and a convent, or "sisters' home" and that these were the buildings contemplated being built in the proposed new unit or project for which a variation from the provisions of the zoning ordinance was requested; that in the instant case the church had created a new parish to meet the needs of its members and that they were only following with respect to the buildings contained in the proposed project the plan and custom followed by the church throughout its establishment in the United States. That, by priests' mansion is meant the residence where the

priest and his assistants, if any, would reside and carry on their work; that they live in the house. That the "convent" or "sisters' home" is the house where the sisters, or nuns, live; they live a community life, eat their meals in common at a common table; they sleep there; they have no other home; the activities of the priests and the sisters will be confined to this particular parish. There are to be no dormitories or living quarters in connection with the proposed school for the purpose of housing the children that attend school nor any other children. The only living quarters on the premises will be the sisters' home and the priests' house. The priests and sisters are the only people that will live on the premises. The sisters are to be located in the "convent" or "sisters' home" for the purpose of teaching in the school. The real purpose of establishing a "convent"on this ground is because it is to be used in connection with the sisters, the teachers of the school. There are no teachers unless there is a school. The priests also have some duties in connection with the school. In the beginning there would be four sisters to teach and one as cook sister or housekeeper, residing in the "sisters' home."

The evidence further establishes that the vacant ground upon which the church and school project is to be built is surrounded on three sides by streets over 40 feet in width, *viz:* East 57th Street, 50 feet wide; Washington Boulevard, 60 feet wide; Central Avenue, 60 feet wide.

In *Keeling* v. *Board of Zoning Appeals, supra,* (transfer denied), we said: "We hold that the right to erect and use a modern church building may in a proper case, such as the one before us, include a parking lot for the use of members in attending church services and any meetings held by the

church, and all such rooms and facilities under one roof as ordinarily form and constitute a part of the building, equipment, and are deemed necessary, or useful, in connection with a modern church of the particular denomination involved. *Western Theological Seminary* v. *City of Evanston* (1927), 325 Ill. 511, 156 N. E. 778."

We believe that the rule stated in the Keeling case, *supra,* is applicable to the facts in the instant case. We also think the law as declared by the Supreme Court of Oregon in the case of *Scott Co.* v. *Roman Catholic Archbishop, Diocese of Oregon* (1917), Ore., 163 Pac. 88, is applicable to the undisputed evidence in this case. We quote with approval as follows: "The only remaining question is whether a convent comes within the restriction. A nun may be briefly designated as a woman of the Catholic religion who lives in a convent under vows of poverty, chastity, and obedience. A convent is a house or building occupied by nuns. We are of the opinion that such a building may fairly be termed a residence or dwelling. It is a dwelling place for nuns.

"There is another ground upon which the consent given by the grantor to the defendant can be sustained: That the erection of a convent may fairly be termed a 'church purpose,' which is the term used in the dispensing clause of the restriction. There is a broad distinction to be drawn between this phrase and the words 'for the erection of a church.' A building may be erected for church purposes other than those connected with divine worship. The word 'church' applies not only to a building used for worship, but to any body of Christians holding and propagating a particular form of belief, as, for instance, the Baptist Church, the Methodist Church, or the Catholic Church; and any building intended to be used primarily for purposes connected with the faith of such religious organization

may be said to be used for church purposes. It is a matter of universal, and therefore judicial, knowledge, that associations of nuns, sisters of charity, and the like are as much a part of the organization of the Catholic Church as its priesthood, and that convents are as much a part of its organization and church policy as church buildings; and in this sense the erection of a convent is as much a church purpose as a house of general worship."

Applying the foregoing principles to the undisputed evidence in the instant case we are unable to agree with the trial court's conclusion that the convent or "sisters' home" proposed to be erected as a component part of a church, priests' mansion, and school project constitutes "a school with living quarters maintained" within the purview of subsection 3 of § 2 of the General Ordinance. We are of the opinion that a convent or "sisters' home" must be considered an integral part of any Roman Catholic church project, which is composed of four component parts, *viz:* church, priests' mansion, a "sisters' home," and school.

The record is devoid of any evidence tending to show that the erection of a convent, or "sisters' home," would in any manner be detrimental or injurious to the public welfare, safety, morals, or general welfare of the community or that such a building will substantially or permanently injure the appropriate use of neighboring property.

Even though we assume that under a strict and literal interpretation of subsection (3), § 2, of the zoning ordinance a "sisters' home" must be considered as a component part of the proposed school instead of being an integral part of the church project, and when so construed, the school becomes

"a grade or high school with living quarters maintained" and therefore falls within the inhibition of said subsection (3), § 2, *supra,* we are convinced that the evidence and facts in it the instant case are sufficient to have authorized and justified the Board of Zoning Appeals in finding that the situation was such, that to carry out the strict letter of the provisions of said subsection (3), § 2, *supra,* would create a case of practical difficulties and unnecessary hardships and that the public health, morals, safety, and general welfare would be secured and substantial justice done by granting the requested variance from said zoning ordinance as expressly authorized by the provisions of § 48-2304, *supra,* and cl. (3) of § 3 and § 22 and subsection (3) of § 23 of said General Zoning Ordinance. Furthermore, the vacant ground upon which the proposed combination unit project would be erected is bounded on three sides by streets over 40 feet in width, and under the provisions of subsection (6), § 23, of said zoning ordinance, the Board of Zoning Appeals was authorized to grant the requested variation.

We are unable to find any evidence in the record tending to show that the Board of Zoning Appeals acted unlawfully, arbitrarily, or unreasonably in granting the requested permit for a variation from the provisions of the General Zoning Ordinance.

Therefore, we conclude that under the broad discretionary power vested in the Board of Zoning Appeals by § 48-2304, *supra,* and cl. (3) of § 3 and §§ 22 and 23, cl. (3) and cl. (6), of the zoning ordinance and the evidence in this case, said Board of Zoning Appeals was fully justified in granting a variation, and in finding as it did that the proposed improvements will substantially serve the public convenience and welfare and will

not substantially or permanently injure and appropriate use of neighboring property.

Many other propositions are presented and discussed in the well-prepared and exhaustive briefs filed by the eminent and able counsel in this case, but in view of the conclusions we have reached, we do not deem it necessary to discuss them in this opinion.

For the reasons stated the trial court erred in its decision.

Judgment reversed with instructions to the trial court to enter judgment affirming in all respects the finding and decision of the Board of Zoning Appeals.

*Royse, J.,* not participating.

NOTE.—Reported in 76 N. E. 2d 597.