Argued September 20; affirmed October 18, 1932

ROMAN CATHOLIC ARCHBISHOP OF DIOCESE
OF OREGON *v.* BAKER, ET AL.

(15 P. (2d) 391)

*Frank S. Grant,* City Attorney and *L. E. Latourette,* Deputy City Attorney, both of Portland, for appellants.

*J. P. Kavanaugh* and *Robert F. Maguire,* both of Portland, for respondent.

CAMPBELL, J. There was submitted to, and approved by the legal voters of the city of Portland, at an election held on the 4th day of November, 1924, an Ordinance No. 45614, known as the zoning ordinance.

Section 2 of the said ordinance provides for:

"Division of the City Into Districts.

"For the purpose of regulating the location of trades and industries and the location of buildings

erected or altered for specific uses, the City of Portland is hereby divided into 'Use Districts' designated as follows:"

The ordinance then proceeds to zone the city into four classes of districts: Class 1, residential districts; Class 2, residential and special temporary residential districts; Class 3, business and special business districts; Class 4, unrestricted district.

Section 3 of said ordinance defines Class 1, residential districts.

"Class 1, Residential District

"(a) Allowed Uses

"In a Class 1, Residential District there may be erected, altered and maintained, single family dwellings, with or without such other accessory buildings as are appropriate to such dwelling including a private garage for not more than three motor vehicles, a pergola, a green house or hot house for private use and a summer house. Gardens will be permitted. The raising of vegetables and produce on vacant ground will be permitted, provided there is no farm house, cattle or stable maintained in connection therewith. The occupants of the above dwellings may be engaged in such professions as are ordinarily carried on in the home, including the home office of a physician, surgeon or dentist. For signs indicating such occupancy see paragraph (b). Signs advertising only the sale or lease of property on which they are located may be erected and maintained.

"It is provided that an addition may be constructed to a building used exclusively as a church, station or substation of a public utility company, corporation or association, by such company corporation or association, provided such addition conforms and does not exceed the height of the existing buildings in height and architectural treatment, and provided such addition is built not closer than ten feet to the rear or side line of the property upon which it is located, and

the grounds around the building shall be maintained with flowers, shrubbery and lawn in harmony with the character of the district, and it is further provided that if at any time there is, or may be a set-back regulation in existence at the time said addition is erected that said addition shall comply with such set-back regulation.''

''(C) Prohibited Uses.

''There is prohibited in such a district all uses and occupancies not allowed in paragraphs (a) and (b), except existing nonconforming uses which may continue in accordance with Section 10.    *   *   *

''(D) A building or buildings for educational, religious, philanthropic, fraternal or other institutional uses may be erected in a Class 1, Residential District, provided that the Council, after notice and public hearing, first approve the location as not detrimental or injurious to the character of the district and or to the public health, peace and safety of the zone. The procedure for such notice and public hearing shall be substantially as provided in Section 13, of said ordinance as amended.''

Section 13 of said ordinance, referred to in section 3, provides as follows:

''SECTION 13. CHANGE OF DISTRICT AND AMENDMENT OF THE ORDINANCE.

''The Council may, after notice and a hearing before it, change the boundaries of zones; or may change a zone, or portion of a zone from one class to another.

''The Council or the City Planning Commission may initiate proposed changes in zones, which changes may be made after notice to owners of property affected and after a hearing before the Council. All changes, except those initiated by the Council or City Planning Commission, shall be made on petition.

*''Area to Be Changed.*

''All owners of property in the area proposed to be changed from one zone to another shall sign a petition asking for a change in the zone specified.

*"Measurements.*

"All distances as specified in this section are exclusive of street widths.

*"Petition.*

"All signers on a petition shall give their addresses and the description of their property as shown on the assessment and tax roll of Multnomah county, showing the lot, block and addition of the property.

*"Ownership in Affected Area.*

"It is not necessary to secure signatures in this district, but a complete list of names and addresses of all owners must be furnished, together with a description of their property as specified in the preceding paragraph.

*"Areas in Other Zones.*

"If there is property within the petition area of the affected district in the same or a less restrictive zone than the proposed change, property in such zone need not be included on the lists of ownerships furnished.

*"Petition Area.*

"Before a petition may be presented to the Council for consideration the petition shall be signed by not less than fifty (50) per cent of all property in the area bounded by lines one hundred (100) feet from and parallel to the side lines of the property proposed to be changed in zone classification. All property owners in the petition area not signing the petition must be listed, giving names, addresses and description of property.

*"Affected District.*

"The district assumed to be affected by a zone reclassification is all property within lines two hundred (200) feet from and parallel to the side lines of the petition area.

*"Procedure.*

"A petition for a change of zone shall be first presented to the City Planning Commission. The City Planning Commission shall check said petition for

sufficiency and shall make a report embodying its recommendations. No petition shall be approved by the Council until the City Planning Commission has submitted a report relative to the same.

"The report of the City Planning Commission shall be transmitted to the Auditor, who shall fix the date of hearing before the Council and notify all persons on the submitted list of the date of hearing. Ten days shall elapse between the time of sending the notice and the holding of the hearing by the Council.

"The same procedure for change of zone shall be followed for all zone or special zone classifications."

In the year 1914, the plaintiff acquired and has ever since owned certain real property of the city of Portland known and described as Lots 9 and 10, Block 1, Laurelhurst Addition to the city of Portland, and in the year 1917 erected a church thereon and has ever since maintained on said premises said church, known as All Saints Church, together with a residence for the use of the pastor.

At the same time as said described real property was acquired, the plaintiff also acquired as a site for a parochial school to be conducted in conjunction with said church, Lots 5, 6, 7, and 8, in said Block 1 of said Laurelhurst Addition. That, thereafter, Lots 7 and 8 of said Block 1, were sold to the Sisters of the Sacred Heart for a Sister's home. The said Lots 7 and 8 have not been built upon and are vacant property, the right to the use of which was, and is now, claimed by the plaintiff. That plaintiff petitioned the City Council of Portland for a permit to erect and maintain on Lots 5 and 6, of said Block 1, a building to be used as a parochial grade school of a maximum capacity of 120 pupils for primary education of the children of the parish served by the church; that said building was to comply with all of the regulations and

specifications of the ordinances of the city of Portland and to be built in accordance with the building code of said city as applied to buildings in that particular vicinity.

Plaintiff was unable to obtain the necessary number of signatures of owners of property, on a petition for a permit to erect said building for school purposes, and requested the City Council to initiate proceedings looking to the granting of said permit, which request was complied with by the City Council. Thereafter said petition and request were referred to defendant, City Commissioner A. L. Barbur, for investigation and report, and who, after making such investigation, recommended that said permit be granted. Thereafter the members of the City Council personally inspected said premises and on July 9, 1930, voted unanimously in favor of granting said permit and instructed the city attorney to prepare an ordinance to that effect.

Subsequently, a number of persons owning property in the area affected by the proposed change, as such area is defined in section 13 of said ordinance, filed remonstrances against the granting of said permit and the matter was again referred to defendant A. L. Barbur, who on August 1, 1930, reported back to the City Council as follows:

"Your Commissioner of Public Works to whom were referred the papers in the matter of the establishing of a school on the property of the Roman Catholic Church, located at East Thirty-ninth and Laddington Court, reports that when the matter was previously heard very few remonstrances, not including those of the three adjoining property owners, were filed, and the recommendation was therefore made that the permit be granted and the City Attorney be directed to prepare the ordinance, which was adopted.

"Later on the matter again came before the Council, some of the property owners claiming that they had not received notices.

"Mr. McClure of the City Planning Comission upon making a very careful check of the protests which have now been filed against the erection of the proposed school building find that the owners of seventy-three and eight-tenths per cent of the property in the area affected object to the school, of which more than fifty per cent represents property in the block on which it was proposed to erect the building.

"In view of the policy of the Council in the past to allow districts to control the class of buildings in their particular district, your Commissioner does not see any alternative other than to report unfavorably on the petition of the Roman Catholic Archbishop of the Diocese of Oregon, and he so recommends."

On August 13, 1930, the City Council voted against the adoption of said report of Commissioner Barbur. On August 17, 1930, said ordinance granting a permit for the construction of said parochial school by the City Council, came on for final action and failed of passage. Consequently the permit was refused.

Thereafter plaintiff brought this suit for the purpose of compelling the City Council of the city of Portland to grant a permit for the erection of said building.

The circuit court granted a mandatory injunction in conformity with the prayer of plaintiff's complaint. Defendants appeal.

The question presented to this court is the constitutionality of the zoning ordinance No. 45614 as applied to the erection and maintenance of this particular school on this specified site in the zone of a Class 1 District.

Defendants in their answer claim: That the lots on which plaintiff wishes to build the school are located on and adjacent to main and extensively traveled

traffic arteries; that on one of said streets there is a double track street car line, having operated thereon, many electrically-propelled street cars; that two of the streets, East Glisan, running east and west, and East 39th, running north and south, have heretofore been designated as through or stop-streets, that is, all vehicular traffic on other streets must stop before entering such through streets; that the site of the school is in about the center of the district which it is intended to serve and that about 75 per cent of the children who would attend said school would be compelled to cross at least one of said through streets and would be in danger of being injured by the traffic thereon; that Lots 7 and 8 of said block, abut on East 39th street, and are intended to be used as a playground; the use of the proposed school site for a school would be dangerous to the public welfare and safety.

It is further claimed that the proposed school site is in a high-class residential district in which many of the residents have expended large sums of money in improving and beautifying their property; that many have bought and improved subsequently to the passing of the zoning ordinance; that the use of plaintiff's property for school purposes would greatly depreciate the value of the property of other residents; that such reduction of value would result from the congregating of the children on the adjacent streets, and from the inconvenience and danger of vehicular traffic and from the noise that necessarily prevails from children at play.

The zoning ordinance under consideration has been held constitutional in certain particulars by this court: *Kroner v. Portland,* 116 Or. 141 (240 P. 536). A similar ordinance was upheld in some further particulars in *Berger v. Salem,* 131 Or. 674 (284 P. 273).

These cases have reference to the encroachment of business houses within a residential zone and the court held that so far as such encroachment was concerned the ordinance was a valid exercise of the police power.

"The exercise of the police power is a matter of legislation and the courts cannot interfere with such expressions of the power unless it is shown that it is purely arbitrary or that the legislation has no connection with or bearing upon legitimate objects sought to be attained." *Kroner v. Portland,* supra.

It is contended by the defendants that the zoning ordinance does not prohibit the location of a building for educational, religious, philanthropic, fraternal, or other institutional uses in districts of Class 1. An examination of the ordinance in question discloses that:

"A building * * * for educational * * * uses may be erected in Class 1, Residential districts provided that the Council, after notice and public hearing, first approve the location as not detrimental or injurious to the character of the district or to the public health, peace, or safety of the zone. The procedure for such notice and public hearing shall be as provided in Sec. 13, of said ordinance as amended."

Section 13, above referred to, prescribes the method of changing a zone or a part of a district from one class of zone to another; and it would appear that this is the procedure to be followed in order to be granted a permit to erect a school building within Class 1 districts. It provides that the Council or City Planning Commission may initiate such a proceeding. Also:

"All changes except those initiated by the Council or the City Planning Commission, shall be made on petition.

"All owners of property in the area proposed to be changed from one zone to another shall sign a petition asking for a change in the zone classification."

If it should be deemed that the construction of a school building upon the property in question would change that property from Class 1 to a less restricted class, then the owners of 50 per cent of the property within the area affected must sign the petition. It further provides:

"Before a petition may be presented to the Council for consideration, the petition shall be signed by not less than fifty (50) per cent of all the property in the area bounded by lines one hundred (100) feet from and parallel to the sidelines of the property proposed to be changed in zone classification.  *  *  *''

Therefore, under this ordinance, if the Council and the Planning Commission refuse to initiate proceedings for a change, which either may or may not undertake, with or without any reason or excuse whatever, then the plaintiff, or the party desiring the change, is left to the caprice of the will of 50 per cent of the owners of property within the district described by the ordinance.

"We are consequently constrained, at the outset, to differ from the Supreme Court of California upon the real meaning of the ordinances in question. That court considered these ordinances as vesting in the board of supervisors a not unusual discretion in granting or withholding their assent to the use of wooden buildings as laundries, to be exercised in reference to the circumstances of each case, with a view to the protection of the public against the dangers of fire. We are not able to concur in the interpretation of the power conferred upon the supervisors. There is nothing in the ordinances which point to such a regulation of the business of keeping and conducting laundries. They seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. So that, if an applicant for

such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of mandamus, to require the supervisors to consider and act upon his case, it would be sufficient answer for them to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility. The power given to them is not confided to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint.'' Yick Wo v. Hopkins, 118 U. S. 356 (6 S. Ct. 1064, 30 L. Ed. 220); Truax v. Raich, 239 U. S. 35 (36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545); Zucht v. King, 260 U. S. 175 (43 S. Ct. 24, 67 L. Ed. 194); Gorieb v. Fox, 274 U. S. 603 (47 S. Ct. 675, 71 L. Ed. 1228, 53 A. L. R. 1210); State ex rel. v. Roberge, 278 U. S. 116 (49 S. Ct. 50, 73 L. Ed. 210).

There is much said in the briefs of counsel for either party regarding what the action of the City Council has been respecting other applications for schools in Class 1, or residential districts. These matters are beside the issue. The fact that defendants are given arbitrary power in any case is sufficient to condemn the ordinance in this respect: *Yick Wo v. Hopkins,* supra.

It is also contended that the erection of a school on this site will lessen the value of the property of many of the adjacent property owners, many of whom bought their property and built a mansion thereon for a home, after the passage of the ordinance, and spent large sums of money in making lawns and setting out shrubbery.

The reasons given for this decrease in value will apply with equal force to any other residential district, either of the first or second class.

They complain that it will be dangerous for the children to cross those through streets. That matter may be easily remedied by compelling vehicular traffic to slow down at a designated crossing.

There is no virtue in the argument that the children will trespass upon private property within the vicinity of the school. There is a sufficient remedy at law to prevent such a trespass.

Then they complain of the noise that the children will make. There is a double track streetcar line on one of the adjacent streets. These cars in their operation are not noiseless. They are run, "from early morn to dewy eve and far into the night," they pass and repass many times every hour.

There are also in the vicinity, two through streets, carrying much vehicular traffic. Automobiles, whether truck or passenger, in operation are not silent. These are driven over those streets at all times of the day and night. The school children will be at play probably a few minutes before nine o'clock in the morning, when school takes up, and during short intermissions, (usually ten minutes in length) one in the forenoon and one in the afternoon, all taking place between 8:45 a. m. and 3:30 p. m. It appears that the noises made by street cars and automobiles are preferable to the prattle and laughter and merry shouts of the children of a primary school. "The playful children just let loose from school." We agree with counsel for defendants that children at play make more or less noise. Children were ever so. They were so, nearly 2,000 years ago, when a man, who was not born in a mansion but in a manger, said, "Suffer little children, and forbid them not to come unto me; for of such is the kingdom of heaven."

Counsel for defendant refer to the necessity of power in the Council to prohibit riding schools, military schools, and other schools. Suffice it to say that those questions are not presented in this cause.

"Specifically, there is nothing in the record to suggest that any damage results from the presence in the ordinance of those restrictions relating to churches, schools, libraries and other semi-public buildings. It is neither alleged nor proved that there is or may be a demand for any part of appellee's land for any of the last named uses; and we can not assume the existence of facts which would justify an injunction upon the record in respect to this class of restrictions. For present purposes, the provisions of the ordinance in respect to these uses may be put aside as unnecessary to be considered. * * * Under these circumstances therefore, it is enough for us to determine as we do, that the ordinance, in its general scope and dominant features, so far as its provisions are here involved, is a valid exercise of authority, leaving other provisions to be dealt with as cases arise directly involving them.

"And this is in accordance with the traditional policy of this court. In the realm of constitutional law, especially, this court has perceived the embarrassment which is likely to result from an attempt to formulate rules or decide questions beyond the necessities of the immediate issue. It has preferred to follow the method of a gradual approach to the general by a systematically guarded application and extension of constitutional principles to particular cases as they arise, rather than by out of hand attempts to establish general rules to which future cases must be fitted." Euclid v. Ambler Realty Co., 272 U. S. 365 (47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016).

Defendants also claim that plaintiff will not be damaged by reason of their refusal to grant the permit demanded.

The right to own property is an inherent right, one of those rights with which men "are endowed by their Creator." This right of ownership is subject to the superior rights of the public to appropriate such property for certain public uses on payment of just compensation. The right to own carries with it the right to use that property in any manner that the owner may desire so long as such use will not impair the public health, peace, safety, or general welfare. The kind of school proposed to be erected, will not interfere with the public health; it cannot affect the public peace; it surely will not endanger the public safety; and by all civilized peoples, an educational institution, whose curriculum complies with the state law, is considered an aid to the general welfare. These propositions cannot be successfully disputed. It is not a question alone of what monetary damage plaintiff may sustain, but also a question of the invasion of one of plaintiff's inherent rights.

It may be assumed that the adoption of the first ten amendments of the Constitution of the United States, commonly called the Bill of Rights, specifically mentions only such rights as to which there might have been a doubt, and so that the people should not be misled, at the same time there was adopted as a part of the Constitution, Amendment IX, which says:

"The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."

When the people of Oregon adopted our Constitution, and designated a Bill of Rights, they also covered the matter of inherent rights of the individual by Sec. 33, Art. 1, of the Constitution of Oregon, which says:

"This enumeration of rights and privileges shall not be construed to impair or deny others retained by the people."

Under the ordinance, the plaintiff could not buy a tract of land in any residential district in the city of Portland and know at the time of the purchase whether a building for school purposes might be erected thereon. There are no specifications in the ordinance as to how or where a site for a school may be located, prior to the action of the City Council. Its location would be a matter entirely within the arbitrary power of the City Council, the City Planning Commission, or 50 per cent of the property owners in a district of which the boundaries are arbitrarily fixed by the ordinance and that power might be exercised or not at the whim or caprice of these bodies.

The decree of the circuit court should be affirmed.

It is so ordered.