Argued April 4, affirmed November 22, 1978

# ANDERSON, *Petitioner,*
## *v.*
# PEDEN et al, *Respondents.*
## (TC 18768, CA 7198, SC 25641)
### 587 P2d 59

Timothy V. Ramis, Portland, argued the cause for petitioner. With him on the brief were Mark P. O'Donnell; O'Donnell, Rhoades & Gerber.

William E. McCann, Deputy District Attorney, Bend, argued the cause for respondents. On the brief were Louis L. Selken, District Attorney for Deschutes County, and Paul J. Speck, Chief Civil Deputy District Attorney.

LINDE, J.

Howell, J., dissenting, joined by Tongue and Lent, JJ.

**LINDE, J.**

Petitioner applied for a permit to place a mobile home on land which Deschutes County has zoned for agricultural and single-family residential uses and certain "conditional uses," including mobile homes. A denial of this application in 1974 was set aside by the circuit court on writ of review in 1975. The court correctly did not order the permit to be issued but remanded the proceedings to the county, retaining jurisdiction. ORS 34.100. After renewed hearings in 1976, respondents again denied the requested permit, and the circuit court in a supplemental order "denied" the writ of review.[1] The Court of Appeals affirmed, 30 Or App 1063, 569 P2d 633 (1977), and we allowed review.

The case presents a number of separate issues which we take up in order.

1. *The Deschutes County ordinance.* The first issue concerns the conditions under which Deschutes County allows a mobile home to be placed on land zoned "A-1" under its zoning ordinance. We begin with the fact that neither these conditions nor the scope of respondents' discretion in granting or denying a permit follows simply from describing a particular type of structure or land use as a "conditional use." Zoning law is not common law but a branch of state and local legislation and administrative law, created by particular statutes, rules, charters, comprehensive plans, ordinances, and resolutions, and the criteria governing such matters as "conditional uses" must be sought there rather than in cases from other cities, counties, or states.[2] The court's first task is to interpret the

---

[1] More accurately, the court had allowed the writ, ORS 34.030, 34.040, but affirmed the challenged decision, ORS 34.100.

[2] *See, e.g.,* the diverse ordinances involved in the following decisions concerning "conditional uses": *Archdiocese of Port. v. Co. of Wash.,* 254 Or 77, 458 P2d 682 (1969); *Christian Retreat Center v. Comm. for Wash. Co.,* 28 Or App 673, 560 P2d 1100 (1977); *Desler v. Lane County Commissioners,* 27 Or App 709, 557 P2d 52 (1976); *Jackson v. Clackamas County Comm.,* 26

Deschutes County ordinance. *See Clackamas County v. Dunham,* 282 Or 419, 579 P2d 223 (1978).

Standing alone, the term "conditional use" can convey quite different meanings. It could mean that the specified use is a permitted use whenever certain conditions exist or are satisfied. Or, second, it may mean that the use will be permitted subject to special conditions attached to the individual permit. Third, "conditional use" historically has often been employed simply as a device to permit discretionary decisions on certain uses, without much attention to the meaning of "conditional." *See* 3 Anderson, American Law of Zoning (2d ed 1968) 147-148, §18.05. Rather than assuming that the term is a known word of art, it would be helpful if draftsmen would spell out what "conditions" are meant; but the Deschutes County Zoning Ordinance, which contains an extensive list of definitions, does not include a definition of the term "conditional use." Insofar as pertinent to the present case, the ordinance provides as follows:

> SECTION 3.010 *Uses Permitted Outright.* In an R-1 Zone the following uses and their accessory uses are permitted outright:
>
> . . . .
>
> 2. Single-family dwelling.
>
> SECTION 3.210 *Uses Permitted Outright.* In an A-1 Zone the following uses and their accessory uses are permitted outright:
>
> 1. Farming as defined in this ordinance.
> 2. Uses permitted in the R-1 Zone.
> 3. Buildings and uses customarily provided in conjunction with farming.
>
> SECTION 3.215 *Conditional Uses Permitted.* In an A-1 Zone the following uses and their accessory uses are

Or App 265, 552 P2d 559 (1976); *Kristensen v. Eugene Planning Com.,* 24 Or App 131, 544 P2d 591 (1976); *The Inn v. City Council, Portland,* 16 Or App 497, 519 P2d 390 (1974); *Hill v. Marion Co. Bd. of Comm.,* 12 Or App 242, 506 P2d 519 (1973); *Sammons v. Sibarco Stations, Inc.,* 10 Or App 43, 497 P2d 862 (1972).

permitted when authorized in accordance with the provisions of Article 7:

. . . .

6. Guest house or mobile home.

. . . .

Article 7 contains these provisions:

SECTION 7.010 *Authorization to Grant or Deny Conditional Uses.* Uses designated in this ordinance as conditional uses may be permitted upon authorization by the Planning Commission in accordance with the standards and procedures established in this article. In permitting a conditional use the Planning Commission may impose, in addition to those standards and requirements expressly specified by this ordinance, any additional conditions which it considers necessary to protect the best interests of the surrounding property or community. These conditions may include increasing the required lot size or yard size, limiting the height of buildings, controlling the location and number of driveways, increasing the street width, increasing the number of off-street parking and loading spaces, limiting the number, size, and location of signs, and required diking, fencing, screening, or landscaping to protect nearby property values. In the case of a use existing prior to the effective date of this ordinance and which is classified in this ordinance as a conditional use, any change in use or in lot area or any substantial alteration of the structure shall conform with the requirements dealing with conditional uses.

SECTION 7.050 *Standards Governing Conditional Uses.* A conditional use shall comply with the standards of the zone in which it is located except as these standards may have been modified in authorizing the conditional use

. . . .

This section continues with special provisions concerning conditional use permits for yards, churches, planned developments, and mobile home parks.

■ Petitioner first argued that the statement in section 3.215 that, in an A-1 zone, a mobile home is "permitted when authorized in accordance with the provisions of Article 7," combined with the statement in section 7.050 that a conditional use "shall comply with the

standards of the zone in which it is located except as the standards may have been modified in authorizing the conditional use," lead to the conclusion that a mobile home is permitted whenever it satisfies the general standards of the zone, subject only to whatever additions or modifications are made in the conditional use permit. His reading would give "conditional use" the second of the several meanings referred to above. The county interprets its ordinance as providing more discretion in allowing a "conditional use." This view finds support in the statement in section 7.010 that such uses "may be permitted" and other references to "permitting" or "authorizing" conditional uses. While either interpretation is tenable, we believe that the county may reasonably act on its view of what authority it meant to reserve in its ordinance.[3] Accordingly, the ordinance did not entitle petitioner to a conditional use permit as a matter of right, subject only to such conditions as might be imposed.

Of course, it does not follow that the county purported to reserve untrammeled discretion to allow or deny such permits. We turn to this issue.

2. *The applicable standards.* After the original remand by the circuit court, counsel for Deschutes County prepared a memorandum for the conduct of subsequent proceedings, which was read aloud by the Chairman of the County Board of Commissioners at the beginning of the new hearing on petitioner's application. With respect to the issue before the board, the memorandum stated:

> *Burden of Proof:*
> a. The burden of proof is upon the proponent in proving that the conditional use should be granted. The applicant must address himself to the following questions:

---

[3] As recently stated in *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 599, 581 P2d 50 (1978), with respect to the administration of a policy by the local agency that has responsibility for enacting the policy: "The courts are finally responsible, but we believe that it is the Board itself, composed as it is of popularly elected local officials directly accountable to their constituency . . . that, in the first instance, should have the power and right to interpret local enactments. *Cf. Green v. Hayward,* 275 Or 693, 706, 552 P2d 815 (1976) (interpretation of county comprehensive plan)."

1) Does it comply with the Comprehensive Plan?

2) Does it meet with the requirements of the A-1 zone, including lot size, depth, area and yard requirements?

3) Will it conserve and stabilize the value of adjacent property?

4) Is it an encouragement of the most appropriate use of land?

5) Since the property is located within the Bend urban growth area, will allowance of the conditional use promote orderly and efficient transition from rural to urban use?

The first and second of these questions are not in dispute. Petitioner agrees that his application had to meet the requirements of the A-1 zone and, in turn, of the comprehensive plan, and respondents concede that it met them. The dispute concerns the propriety of the third, fourth, and fifth criteria, on which the board found that petitioner had not met the burden of proof. At issue is whether these tests could properly be added to the first two at all, whether they were too indefinite, and whether they were adopted without proper procedures. Examination of the three challenged criteria yields different results.

■ On the issue whether they could be added at all, we have held above that the ordinance contemplated the exercise of some range of discretion in allowing or denying conditional uses. Accordingly, it was not improper to make approval of an application contingent on criteria beyond those required by the zone and the comprehensive plan.

■ Procedurally, two of the three additional tests, whether the proposed use would "conserve and stabilize the value of adjacent property" and whether it would be "an encouragement of the most appropriate use of land," were not newly adopted at the beginning of this proceeding. They were taken verbatim from the "Purpose" section of the Deschutes County Zoning

Ordinance.[4] When a statute or other legislation is prefaced by a list of "purposes," these purposes are not *ipso facto* standards to govern administrative decisions under it. Depending on what other standards the legislation states or requires to be adopted, the statement of purposes may or may not be intended to serve that role. Cf. *Marbet v. Portland General Electric Co.,* 277 Or 447, 459, 561 P2d 154 (1977). Unlike the statute in that case, the Deschutes County ordinance does not expressly direct the board to adopt standards for the issuance of permits. Respondents have apparently construed the purposes stated in section 1.020 of their ordinance to be standards for the exercise of further discretion under it. That is not an implausible reading; indeed, the stated "purposes" are largely identical with the "minimum requirements" that this court found to be "standards" under the Milwaukie ordinance in *Jehovah's Witnesses v. Mullen,* 214 Or 281, 288-289, 330 P2d 5, 74 ALR2d 347 (1958). If the respondents have so construed them, the two quoted tests did not require further formal adoption; their reading aloud merely served to give notice which of the items listed in section 1.020 the board considered to be at issue in this proceeding.

However, the final test imposed on petitioners, whether the proposed use will "promote orderly and

---

[4] Section 1.020 provides:

*Purpose.* The purposes of this ordinance include the following:

1. To promote the orderly growth of Deschutes County.
2. To protect and enhance the environment.
3. To conserve and stabilize the value of property.
4. To reduce excessive traffic congestion.
5. To prevent overcrowding of land by establishing standards for population density.
6. To provide adequate open space for light and air.
7. To conserve natural resources.
8. To encourage the most appropriate use of land.
9. To prevent water and air pollution.
10. To facilitate fire and police protection.
11. To provide for community facilities.
12. To promote and protect the public health, safety, convenience, and general welfare and to carry out the Comprehensive General Plan of Deschutes County.

efficient transition from rural to urban use" of property within the Bend urban growth area, presents a problem. This test does not paraphrase a part of the Deschutes County ordinance. It appears to have been taken from Goal 14, "URBANIZATION," of the Goals of the Land Conservation and Development Commission,[5] to which the county's zoning ordinance was

[5] GOAL:

To provide for an orderly and efficient transition from rural to urban land use.

Urban growth boundaries shall be established to identify and separate urbanizable land from rural land.

Establishment and change of the boundaries shall be based upon consideration of the following factors:

(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

(2) Need for housing, employment opportunities, and livability;

(3) Orderly and economic provision for public facilities and services;

(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

(5) Environmental, energy, economic and social consequence;

(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

(7) Compatibility of the proposed urban uses with nearby agricultural activities.

The results of the above considerations shall be included in the comprehensive plan. In the case of a change of a boundary, a governing body proposing such change in the boundary separating urbanizable land from rural land, shall follow the procedures and requirements as set forth in the Land Use Planning goal (Goal 2) for goal exceptions.

Any urban growth boundary established prior to January 1, 1975 which includes rural lands that have not been built upon shall be reviewed by the governing body, utilizing the same factors applicable to the establishment or change of urban growth boundaries.

Establishment and change of the boundaries shall be a cooperative process between a city and the county or counties that surround it.

Land within the boundaries separating urbanizable land from rural land shall be considered available over time for urban uses. Conversion of urbanizable land to urban uses shall be based on consideration of:

(1) Orderly, economic provision for public facilities and services;

(2) Availability of sufficient land for the various uses to insure choices in the market place;

(3) LCDC goals; and,

bound to conform. ORS 197.175, 197.250.[6] The board found that petitioner failed the test because the neighborhood was likely to be incorporated within the City of Bend, where mobile homes are not allowed outside special parks, subdivisions, or other designated areas. Petitioner contends that the board misconstrued Goal 14, which is concerned with planning and controlling the rate and sequence of urban growth and the extension of urban services, not decisions on individual conditional uses that do not affect the stated aspects of "urbanization." Thus, if respondents acted upon an erroneous assumption that they were applying a state-imposed test, the court on writ of review should have ordered them to reconsider under a correct view of the law. ORS 34.040(4), 34.100. On the other hand, respondents might have adopted a policy of anticipating the future use of land expected to be annexed to a city even if Goal 14 itself did not impose this test. This would be consistent with other policies favoring cooperation between cities and counties in land use planning.[7] But if respondents were adopting such a policy, they apparently stated it for the first time at the opening of this hearing.

(4) Encouragement of development within urban areas before conversion of urbanizable areas.

GUIDELINES: . . . .

OAR 660-15-000, App A.

[6] The present case does not involve the effect of ORS 197.275, enacted after these proceedings, which provides:

. . . .

(2) After the commission acknowledges a city or county comprehensive plan and implementing ordinances to be in compliance with the goals pursuant to ORS chapter 197 and any subsequent amendments to the goals, the goals shall apply to land conservation and development actions and annexations only through the acknowledged comprehensive plan and implementing ordinances unless: . . . .

[7] Goal 14, for example, provides that the establishment and change of urban growth boundaries "shall be a cooperative process" between cities and counties, and Guideline B 4 to the Goal provides that the implementation of land use controls "should be mutually supporting" with respect to the timing and location of public facilities and services.

[ 322 ]

■■ The record does not clearly show which view the board took of its "orderly transition" criterion, and respondents fail to address petitioner's contention on this issue. Respondents do not deny that under the ordinance an applicant should be able to learn in advance of making application by what criteria his proposal will be judged. However, assuming that the "orderly transition" test was first adopted in announcing it at the opening of the hearing, the record does not reveal that this objection was raised in the circuit court, nor had petitioner's counsel made objection or claimed surprise at the board's hearing. Therefore the court did not err in not granting relief on this ground.[8]

3. *Adequacy of the standards.* Petitioner attacks the fourth of the five questions on which he was assigned the burden of proof, whether the proposed use would be "an encouragement of the most appropriate

_____

[8]The Court of Appeals cited *Marbet v. Portland General Electric Co., supra,* for the proposition that standards applied by an administrative body may be stated and refined in the course of adjudicatory proceedings. Petitioner cites the same decision for the proposition that even so, this may be done only in the form of a "legislative-type" hearing in which other interested persons than the immediate parties can participate. The court said: "It is not indispensable that every standard under ORS 469.470(3) and 469.510 have been adopted in the form of a rule before the initiation of a contested case, as long as it is in fact adopted as a standard, upon notice and procedures that allow for the presentation of views and data on the issues involved, and sufficiently in advance of the final decision so that the applicant and other parties can address the import of the standard for the particular project." 277 Or at 463.

It is important to keep in mind that *Marbet* involved an agency whose authorizing statute directed it sometimes to "set standards *and* promulgate rules" and sometimes to "adopt standards promulgated *as* rules," and whose procedures were governed by the Administrative Procedure Act, ORS ch 183. 277 Or at 458-464. (Emphasis supplied.) It does not purport to pronounce "administrative common law." Similarly, the procedures for conditional use decisions in Deschutes County must be those expressed or implied in the ordinances, resolutions, charter, and statutes governing these decisions, such as, for instance, the requirement of findings implied from the statutory obligation to measure a zone or plan change against the comprehensive plan. *South of Sunnyside Neighborhood League v. Clackamas Co. Comm.,* 280 Or 3, 569 P2d 1063 (1977); *Roseta v. County of Washington,* 254 Or 161, 458 P2d 405 (1969). Of course a board may wish to proceed on the analysis stated in *Marbet* even when no statute compels it to do so.

use of land," as being an "unconstitutionally vague standard."

Like the third test, conservation of property value, the "most appropriate use" criterion was taken from the "Purpose" section of the Deschutes County Zoning Ordinance, *supra* note 4. As a statement of a goal to be served by a land use ordinance, the phrase to "encourage the most appropriate use of land" is not only unobjectionable, it is self-evident to the point of redundancy. It is also undeniably vague, unless the "appropriate" uses of land are ranked elsewhere. Lifted directly into the decision of an individual case, the phrase telescopes two distinct questions into one: First, what makes one use more "appropriate" than another, which is a policy or value judgment, and second, will the applicant's proposal "encourage" the use that is deemed most appropriate.[9] This dual nature of the test risks being submerged in an ad hoc reaction to the concrete proposal. But petitioner has difficulty in finding a constitutional premise for his attack.

■ Vagueness or indefiniteness of legislative directives has differenct significance in different contexts. When legislation directly commands or forbids certain conduct at the risk of a penalty, vagueness is regarded as incompatible with due process of law under the fourteenth amendment because the addressee does not have fair notice of what conduct will incur or avoid the penalty, this judgment being left to a prosecutor, a jury, or a court after the fact. *See, e.g., Papachristou v. City of Jacksonville,* 405 US 156 (1972), and cases cited at 162; *State v. Hodges,* 254 Or 21, 27, 457 P2d 491 (1969). But this test of penal laws does not apply to the standards of civil liability, as is obvious from such examples as the standards governing negligence, products liability, unconscionability in contract terms, or antitrust law.

---

[9] *Compare Marbet v. Portland General Electric Co.,* 277 Or at 469, n 18, involving the same duality in the issue of "undue impact upon the environment."

■ The problems are different when legislation delegates authority to make decisions looking to the future rather than imposing sanctions for past or present conduct. The issue then is not lack of fair notice but whether the lawmaker's political responsibility for choosing at least the general direction of public policy among competing alternatives has been abdicated without guidance to administrative officials. It is an issue of the constitutional allocation of powers, not of procedural fairness to particular persons. While it must always be possible to determine what rules can fairly be said to carry out the policy of the delegating legislation under which they are made, such legislation is not unconstitutional merely because the terms of the legislative directive are general and vague.

In *Warren v. Marion County,* 222 Or 307, 353 P2d 257 (1960), which involved an attack on a county building code adopted under ORS ch 215, this court rejected the shibboleth that all legislative delegation of authority must be tested by the verbal adequacy of the standards stated for its exercise. There the authority exercised was rulemaking, i.e. the adoption of building codes which "are in themselves a statement of specific standards for the construction of buildings," 222 Or at 315, and the authorization went to an elected local government that itself had political accountability for lawmaking as well as administration.

Here the local government has both acted legislatively, in the zoning ordinance, and delegated to its board of commissioners the administrative discretion in further policy development contemplated by the ordinance. The purposes of the ordinance set forth in note 4, including the encouragement of the "most appropriate use of land," certainly summarize the general policy of land-use regulation sufficiently to let respondents proceed to develop more specific policies without having to amend the ordinance. Indeed, respondents could do so even without such a prefatory list. The question remains whether they could refine their general land use policies in the course of deciding

[ 325 ]

upon individual applications without prior rulemaking. In response to the court's request to the parties, petitioner was not able to cite a decision of the United States Supreme Court indicating that policy development under an extremely broad delegation could not constitutionally proceed by the decision of concrete cases without prior rulemaking.[10] We have no basis for holding that articulation of standards in advance of a specific conditional-use proceeding is imposed on Deschutes County by the federal fourteenth amendment.

■ If petitioner's attack on the vagueness of the "most appropriate use" criterion is to have a constitutional footing, it must be found in the risk that ad hoc policy making will grant to some "citizen or class of citizens privileges, or immunities, which, upon the same terms, [do] not equally belong to all citizens." Or Const art I, sec 20. That risk is real in all discretionary administration. But an attack based on this premise must show that in fact a policy unlawfully discriminating in favor of some persons against others either has been adopted or has been followed in practice.[11]

---

[10]The court addressed this question to the parties:

> Need the criteria for such a decision meet any particular standard of specificity, and by virtue of what provisions or principles of law? If the Fourteenth Amendment, what decisions of the United States Supreme Court in the context of local or administrative regulation are applicable?

Petitioner did cite *Papachristou v. City of Jacksonville, supra,* but as stated above, that decision is a modern statement of the rule against vague penal laws.

[11]In *Jehovah's Witnesses v. Mullen, supra,* the court held that a claim of unconstitutional discrimination among applicants must be, but had not been, demonstrated by evidence. 214 Or at 297-302. Earlier, in *Archbishop of Oregon v. Baker,* 140 Or 600, 15 P2d 391 (1932), the court noted that standardless authority to grant or refuse permits could deny one the equal protection of the laws if it conferred, "not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, *not only as to places, but as to persons."* 140 Or at 609, quoting *Yick Wo v. Hopkins,* 118 US 356, 366 (1886) (emphasis supplied). The point of the emphasized distinction is apparent when one considers that a single owner of two lots, whose application is granted for one lot but denied for the other in identical circumstances,

In this case, it appears that respondents adopted the view that in a conditionally permissible use, compatibility of appearance with surrounding structures was one element bearing on "the most appropriate use of land," although they did not adopt it in the form of a general rule. Whether it stands as an element for all similar decisions or was applied only in deciding this case cannot be determined on the record before us. Adoption of more meaningful criteria than "appropriate use" by general rulemaking in advance of a concrete case may well be the best safeguard against the risk of inconsistent and *ad hominem* decisions, but it does not necessarily follow that such a procedural requirement can be deduced directly from the constitutional obligation to avoid favoritism. Petitioner has presented no argument that the requirement can be inferred from a relevant statute, charter, or ordinance. Since the proceedings in this case, the legislative assembly has in fact required that land use permit decisions be based on "standards and criteria which shall be set forth in the zoning ordinance or other appropriate ordinance or regulation . . . ." ORS 215.416(5).[12] The statute will presumably govern any

might find logical difficulty in showing that he is a person who has been discriminated against under the terms either of article I, section 20, or the equal protection clause, whatever other claim he might make.

Although the ordinance in *Archbishop of Oregon v. Baker* stated that schools might be erected in residential areas if the city council "approve[d] the location as not detrimental or injurious to the character or the district or to the public health, peace, or safety of the zone," the court did not pursue the question whether compliance with this standard itself forbade discrimination among applicants, a natural construction that would obviate invalidating the ordinance on that ground.

[12] ORS 215.416 provides:

(1) When required or authorized by the ordinances, rules and regulations of a county, an owner of land may apply in writing to such persons as the governing body designates, for a permit, in the manner prescribed by the governing body.

(2) The hearings officer shall hold at least one public hearing on the application and within 90 days after receiving it deny or approve it. However, with the agreement of the county and the applicant, the proceeding on the application may be extended for a reasonable period

renewed application petitioner may make. Thus we need not further pursue the question of implying a rulemaking requirement from constitutional or other premises.

4. *Neighborhood opposition.* Petitioner contends that respondents' decision was triggered primarily by the opposition of neighboring landowners, and that this is not a permissible basis for decision under the zoning ordinance and under the fourteenth amendment, as applied by the United States Supreme Court in *Washington ex rel Seattle Title Trust Co. v. Roberge,* 278 US 116 (1928).[13] It deserves notice that in the cases invalidating requirements of neighborhood consent, the views of neighboring landowners were not only made a factor in the decision of the responsible authorities; rather, the actual decision was delegated in whole or in part to this class of interested private parties.[14] However, apart from constitutional objections there are good reasons why lawmakers do not

of time, as determined by the hearings officer, but not to exceed six months from the date of the first public hearing on the application.

(3) The application shall not be approved if the proposed use of land is found to be in conflict with the comprehensive plan of the county and other applicable ordinance provisions. The approval may include such conditions as are authorized by statute or county legislation.

(4) Hearings under this section shall be held only after notice to the applicant and also notice to other persons as otherwise provided by law.

(5) Approval or denial of a permit application shall be based on standards and criteria which shall be set forth in the zoning ordinance or other appropriate ordinance or regulation of the county and which shall relate approval or denial of a permit application to the zoning ordinance and comprehensive plan for the area in which the proposed use of land would occur and to the zoning ordinance and comprehensive plan for the county as a whole.

(6) Approval or denial of a permit shall be based upon and accompanied by a brief statement that explains the criteria and standards considered relevant to the decision, states the facts relied upon in rendering the decision and explains the justification for the decision based on the criteria, standards and facts set forth.

[13] See also *Eubank v. City of Richmond,* 226 US 137 (1912); *Archbishop of Oregon v. Baker,* 140 Or at 608-610.

[14] The earlier cases were explained on this basis in *Eastlake v. Forest City Enterprises, Inc.,* 426 US 668, 677-678 (1976).

make the preferences of a class of private persons a factor to be counted in deciding upon individual applications of public policy. The class whose wishes count on a question such as a conditional use has no self-evidence contours (who is within the relevant "neighborhood?"), nor is it obvious how to weigh their preferences (does one purporting to speak for a household of six carry three times the weight of a childless couple?); the risk is that those with the strongest views, or the greatest personal interest, will count disproportionately to the larger number of those who are content to entrust the decision to the responsible officials. Thus the ordinance places on the planning commission and board members themselves the responsibility for determining the community's interests in plans and developments that will fix the use of land for a period of years, a period during which there will be normal, continual turnover in the persons immediately concerned. This is equally so whether there is objection or absence of objection or even affirmative support for the proposal. Petitioner is correct that the ordinance makes neither support nor objection a factor to be considered in a conditional use decision. Of course, this does not preclude a commission or board from considering the evidence submitted by the persons most familiar with the neighborhood insofar as it bears on the objective factors important to the future of the area affected by the proposed use.

In response to the court's inquiry, the county agrees that neighborhood objections are not a criterion and denies that they played any role in this decision.[15] Petitioner claims that they nevertheless were the actual though not the acknowledged basis for the

---

[15] The court addressed these questions to the parties:

Are there grounds in the record for concluding that the Board of County Commissioners based its decision, in whole or in part, on the fact of public opposition to petitioner's request for a conditional use permit?

Does the zoning ordinance, as properly construed, permit the Board to take public opposition into account in deciding whether or not to grant a conditional use permit for a mobile home in an A-1 zone?

denial of his application. The record shows the following: After the first hearing on petitioner's application, the planning commission approved the conditional use. Upon objections by opponents the County Board of Commissioners referred the application back to the planning commission. The planning commission disapproved the proposal after a second hearing and after a further hearing the board in turn denied the application. The board in a letter of notification explained this decision on several grounds, the first of which read as follows:

> This decision was based on the following facts as submitted by the Planning Commission:
>
> 1. A majority of the property owners were in opposition to the request as indicated by petition. There was no correspondence received from property owners in the area (other than the applicant) in favor of the application.
>
> . . . .

In reversing the board's decision, the trial court held, among other grounds, that this "finding" by itself would not support denial of the application.

After the further hearing following this remand, the board once more denied the application on the ground that petitioner had failed to satisfy the third, fourth, and fifth criteria discussed earlier, but without referring to neighborhood opposition as such. Respondents' position is that opposition testimony at this hearing was considered not as a factor in itself but only as bearing upon the issues of maintenance of land values and compatibility with existing uses. The circuit court sustained the board's findings and conclusions in the supplemental decision of August 26, 1976, which is before us in this case.

Whenever an exercise of judgment or of discretion is set aside on judicial review for resting wholly or partly on improper considerations, a reviewing court may later face the issue whether the improper considerations were eliminated on remand. The problem is

[ 330 ]

particularly troublesome when the initial practice is claimed to have involved discrimination on racial or other constitutionally forbidden grounds, *see Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 US 252 (1977); *Mount Healthy Board of Education v. Doyle,* 429 US 274 (1977), but it is not limited to such sensitive areas. *See, e.g., SEC v. Chenery Corp.,* 318 US 80 (1943), *SEC v. Chenery Corp.,* 332 US 194 (1947).[16] The losing party may contend that the original decision has merely been dressed up in legally acceptable garb. But a remand generally presupposes that the acting body might reach the same result on proper grounds, and when nothing contrary appears in the record, proceedings by writ of review provide little room for such a contention.

■ Petitioner submitted excerpts from minutes of the Deschutes County Planning Commission covering hearings held on two other conditional use applications for mobile homes in April and in June, 1976.[17] The excerpts show that at those later hearings, members of the planning commission were plainly placing substantial weight on the presence of neighborhood opposition as such, while downplaying the impact on property values as a criterion. But we cannot infer from these later minutes of the planning commission that the Board of Commissioners in petitioner's case simply repeated its rejection on the ground of neighborhood opposition and "rationalized" it by cleaned-up findings and conclusions, as petitioner contends. The planning commission may simply not yet have "got the message" of the board's adoption of more systematic

---

[16]The problem in its constitutional context is discussed in a symposium in 15 San Diego L Rev 925-1183 (1978). *See also* Comment, *Proof of Racially Discriminatory Purpose Under the Equal Protection Clause: Washington v. Davis, Arlington Heights, Mt. Healthy, and Williamsburgh,* 12 Harv Civ Rts-Civ Lib L Rev 725 (1977).

[17]There was no objection to the submission of these excerpts. The minutes are public records under ORS 192.410-192.500.

and judicious criteria and findings following the re-mand by the circuit court in this case. The commis-sion's errors in the later proceedings may have been corrected by the board on appeal. Petitioner did not attempt to submit evidence that the board itself engaged in so inconsistent and unprincipled applica-tion of its asserted standards for conditional use permits as to amount to a sham, and we have no occasion to consider whether or how such a showing could be made within the existing form of proceeding on writ of review. Accordingly, the court did not err in its decision on writ of review.

Affirmed.

**HOWELL, J.,** dissenting.

Petitioner applied for a permit to place a mobile home on property he owns in Deschutes County. The county ordinance provides that a mobile home is a "conditional use" in the neighborhood where peti-tioner's property is located. Petitioner's application was denied because he failed to satisfy standards beyond those required by the ordinance.[1] I do not believe the standards promulgated by the county were proper in light of the language used in the controlling ordinance, and I would therefore reverse the decision of the Court of Appeals.

The controlling ordinance provides as follows:

"SECTION 3.215. *Conditional Uses Permitted.* In an A-1 Zone the following uses and their accessory uses are

---

[1] These standards were stated in the form of the following questions:

(1) Does [the conditional use] comply with the Comprehensive Plan?

(2) Does it meet with the requirements of the A-1 zone, including lot size, depth, area and yard requirements?

(3) Will it conserve and stabilize the value of adjacent property?

(4) Is it an encouragement of the most appropriate use of land?

(5) Since the property is located within the Bend urban growth area, will allowance of the conditional use promote orderly and efficient transition from rural to urban use?

permitted when authorized in accordance with the provisions of Article 7:

"* * * * *.

"6. Guest house or mobile home.

"* * * * *.

"SECTION 7.010. *Authorization to Grant or Deny Conditional Uses.* Uses designated in this ordinance as conditional uses may be permitted upon authorization by the Planning Commission in accordance with the standards and procedures established in this article. In permitting a conditional use the Planning Commission may impose, in addition to those standards and requirements expressly specified by this ordinance, any additional conditions which it considers necessary to protect the best interests of the surrounding property or community. These conditions may include increasing the required lot size or yard size, limiting the height of buildings, controlling the location and number of driveways, increasing the street width, increasing the number of off-street parking and loading spaces, limiting the number, size, and location of signs, and requiring diking, fencing, screening, or landscaping to protect nearby property values. In the case of a use existing prior to the effective date of this ordinance and which is classified in this ordinance as a conditional use, any change in use or in lot area or any substantial alteration of the structure shall conform with the requirements dealing with conditional uses.

"SECTION 7.050. *Standards Governing Conditional Uses.* A conditional use shall comply with the standards of the zone in which it is located except as these standards may have been modified in authorizing the conditional use * * *."

I agree with the statement by the majority that the county's discretion cannot be defined solely by reference to the term "conditional use." As noted by the majority, the term "conditional use" may contemplate the following meanings: (1) that the use is permitted only when certain conditions are satisfied; (2) that the use is permitted, but the county can impose conditions on how the property is adapted to the use; or (3) that the use is permitted solely at the discretion of the

county. To determine which meaning applies, the court must look to the language used in the ordinance at issue. With respect to the ordinance in the present case, the majority concludes that either of the latter two above interpretations is "tenable," but that "the county may reasonably act on its view of what authority it meant to reserve in its ordinance." With all due respect, I disagree with both these assertions.

First, I do not believe a fair reading of the language in the ordinance supports the assertion that the county reserved discretionary power to grant or deny conditional use permits. The ordinance provides that "the following uses and their accessory uses *are permitted* when authorized in accordance with the provisions of Article 7: * * * 6. Guest house or mobile home." Section 3.215 (emphasis added). Section 7.010 lists a number of conditions that may be imposed by the Planning Commission. All of these conditions, however, go to the matter of adapting the lot to the special use. They are conditions that *assume the issuance* of the permit, not conditions to be used in *deciding whether to issue* the permit. This would seem to indicate that the ordinance contemplates the definition of "conditional use" urged by the petitioner, i.e., a use permitted subject to special conditions attached to the individual permit. Thus, the county could require an owner wishing to place a mobile home on his eligible property to place the home on a certain part of the property, to fence, screen or landscape the home so as to shield it from the view of neighbors, etc. The county could not, however, deny the application outright, as it did in the instant case.[2]

---

[2]The majority focuses on the language "may be permitted" in deciding that the ordinance contemplates the first, "discretionary" definition of conditional use. As noted above, however, Section 3.215 of the ordinance provides that conditional uses "are permitted" when authorized in accordance with the provisions of Article 7. Additionally, the "may/shall" distinction has been recognized by this court as having questionable utility in ascertaining legislative intent, particularly when other language in the statute indicates that it was intended to be mandatory rather than discretionary. *Dilger v. School District 24CJ,* 222 Or 108, 117, 352 P2d 564 (1960).

Secondly, even if it is conceded that this interpretation of the ordinance is not compelled by the actual language used, I cannot agree with the majority's assertion that the problem of construing the ordinance is resolved solely by reference to the interpretation adopted by the county.[3] Although the county's interpretation is entitled to some deference, consideration must also be given to the reasonable expectations of the property owner who purchases his property on the basis of existing use restrictions. In my view, the majority's approach is not only unfair to the property owner, it also does little to encourage the county to be precise in drafting land use restrictions.

Finally, above and beyond the implications of the majority opinion with respect to judicial review of zoning ordinances generally, I believe the majority has reached an unreasonable result on the facts of this particular case. The ordinance purports to make mobile homes a "conditional use" in petitioner's neighborhood. One of the "conditions" that petitioner was required to meet was a showing that his proposed use would "conserve and stabilize the value of adjacent property." It would be difficult to convince some people, however, that a mobile home could *ever* conserve the value of adjacent property. Consequently, the "condition" imposed by the county on use of property as a mobile home site, as a practical matter, prohibits the use. Not only is this "condition" inconsistent with the county's decision to make mobile homes a "conditional use," it also makes the county ordinance at least arguably inconsistent with Goal 10 of the

---

[3]The only authority cited by the majority for the proposition that the county's interpretation of its own ordinance is controlling is *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 599, 581 P2d 50 (1978). In that case, however, we went on to note:

"While the interpretation of the Board *cannot supplant our duty,* that interpretation is entitled to *some weight * * *." Id.* at 599-600 (emphasis added).

In my view, the majority opinion in the present case goes far beyond our holding in *Fifth Avenue Corp.* and gives the county's interpretation of its ordinance almost conclusive weight.

State Land Conservation and Development Commission.[4]

For these reasons, I respectfully dissent.

Tongue, J., and Lent, J., join in this dissent.

---

[4] Goal 10 provides:

"Buildable lands for residential use shall be inventoried and plans shall encourage the availability of adequate numbers of housing units at price ranges and rent levels which are commensurate with the financial capabilities of Oregon households * * *." Oregon Administrative Rules ch. 660 at 53 (1978).

In light of the current cost of traditionally constructed housing, I would interpret this goal as imposing a duty on Oregon counties to make reasonable accommodations for use of property as mobile home sites.